**CANAL INSURANCE COMPANY,**
Appellant

v.

**Mark HOPKINS d/b/a Hopkins Towing and Recovery, Appellee.**

No. 12–06–00411–CV.

Court of Appeals of Texas,
Tyler.

Oct. 24, 2007.

J. Gene Bailey, Bedford, for Canal Insurance Company.

Tom D. Rorie, for Mark Hopkins d/b/a Hopkins Towing and Recovery.

Panel consisted of WORTHEN, C.J., GRIFFITH, J., and HOYLE, J.

## OPINION ON REHEARING

JAMES T. WORTHEN, Chief Justice.

Canal Insurance Company filed a motion for rehearing, which is granted. The court's opinion of June 29, 2007 is withdrawn and the following opinion is issued in its place.

Canal Insurance Company appeals the trial court's final judgment in a lawsuit brought by Mark Hopkins d/b/a Hopkins Towing and Recovery to recover towing charges incurred by Paul Mullinax, Canal's insured. Canal raises ten issues on appeal. We affirm.

### BACKGROUND

On August 20, 2004, Henry Sweeney was operating a tractor-trailer rig hauling a load of peas when he lost control of the rig, which traveled off the road and into a deep ditch. The tractor-trailer struck several small trees and, eventually, rolled over onto its left side. Sweeney was the lessee and operator of the tractor, which was owned by Mullinax. Mullinax also owned the trailer. Both the tractor and trailer were insured against physical damage under an insurance policy issued by Canal. Mullinax was the named insured.

Sweeney was injured in the wreck and was removed from the tractor by emergency personnel. As Sweeney was being removed from the tractor, Trooper Jimmie Faulkner of the Texas Department of Public Safety arrived at the wreck site. After Sweeney had been removed and placed on a gurney, Trooper Faulkner approached Sweeney and briefly interviewed him. Following the interview, Sweeney was taken by ambulance to a hospital for treatment.

Trooper Faulkner ordered that a wrecker service be called in to tow the tractor and trailer. After two other wrecker services had refused the job because they "didn't have the capabilities to do it," Hopkins was called in to do the job. Because of the layout of the wreck site and the position of the tractor and trailer, Hopkins determined that they would have to use special air bags to return the trailer to an upright position. Hopkins recruited a subcontractor out of Tyler, Texas to supply the necessary air bags and operating personnel. In addition, Hopkins supplied three of his tow trucks and seven or eight

employees who worked through the night, and in the rain, in order to remove the tractor and trailer from the ditch.

The tractor and trailer were initially towed to a vehicle storage facility operated by Hutto's Wrecker Service. At Mullinax's later request, Hopkins subsequently towed both to Hopkins's own vehicle storage facility. Hopkins submitted a bill of $12,690.00 to Mullinax for the work his company performed to remove the tractor and trailer and tow them to Hutto's facility, and for the work performed by the airbag subcontractor. When Mullinax failed to pay the bill, Hopkins sought payment from Canal. Because the language of the insurance policy in question did not expressly provide coverage of third parties who perform towing services, Canal refused to pay Hopkins.

Hopkins filed a lawsuit against both Mullinax and Canal. Hopkins's cause of action against Canal was based upon section 2303.156(b) of the Texas Occupations Code. *See* Tex. Occ.Code Ann. § 2303.156(b) (Vernon 2004). Mullinax filed a pro se answer but did not appear at trial. Canal filed an answer and appeared at trial by way of its representative, Ron King, and through counsel. Following a bench trial, the trial court entered a final judgment against Mullinax and Canal, holding them jointly and severally liable to Hopkins for the initial towing charges of

$12,690.00 plus prejudgment interest and court costs. This appeal followed.

## CONSENT TO TOW

In its first issue, Canal challenges the legal and factual sufficiency of the evidence supporting the trial court's implied finding of fact that the tow in question was not performed with consent, a nonfinding.[1]

### Standard of Review

■ Section 2303.003(a) of the Occupations Code states that "[t]his chapter does not apply to a vehicle stored or parked at a vehicle storage facility with the consent of the owner of the vehicle." Tex. Occ.Code Ann. § 2303.003(a) (Vernon 2004). As such, a defendant may raise the issue of consent as a defense to actions brought under section 2303.156(b). *Cf. Brown & Root, Inc. v. Shelton*, No. 12–01–00259–CV, — S.W.3d —, —, 2003 WL 21771917, at *2 (Tex.App.-Tyler July 31, 2003, no pet.) (not yet released for publication) (construing a statute of repose as a defense to a personal injury action based on strict liability or negligence). For the purposes of our analysis here, we assume that Sweeney could give consent under section 2303.003(a).[2]

■ In this case, the issue of consent was a question of fact. *See Tackett v. Terrill*, 404 S.W.2d 158, 160 (Tex.Civ.App.-Eastland 1966, no writ) ("[I]t is apparent that whether the widow consented or not

---

1. Both parties have assumed that the trial court made an implied nonfinding of consent, and neither addresses the nonfinding's omission from the trial court's written findings of fact. Absent any argument to the contrary, we will imply, arguendo, such a nonfinding and decline to conduct any review of this issue using the methodology set forth in *Vickery v. Commission for Lawyer Discipline*, 5 S.W.3d 241, 253 (Tex.App.-Houston [14th Dist.] 1999, pet. denied).

2. Both Mullinax, who owned the tractor and trailer, and Sweeney, who was the lessee of the tractor, fall within the Occupations Code definition of "owner." *See* Tex. Occ.Code Ann. § 2303.002(5) (Vernon 2004). Additionally, the tractor and trailer each qualify as a "vehicle" under the Code. *See* Tex. Occ.Code Ann. § 2303.002(7) (Vernon 2004). Therefore, under the express language of the Code, Sweeney could consent to the tow of the tractor but not the trailer. *See id.* § 2303.002(5). We do not address whether Sweeney was Mullinax's agent.

[to an autopsy of her late husband] was a question of fact."). Implied findings of fact may be challenged for legal and factual sufficiency. *Wade v. Comm'n for Lawyer Discipline*, 961 S.W.2d 366, 374 (Tex. App.-Houston [1st Dist.] 1997, no pet.). The standard of review is the same as that applied to a jury's findings or a trial court's written findings of fact. *Id.*

When reviewing a finding of fact for legal sufficiency, we may set aside a finding of fact only if the evidence at trial would not enable a reasonable and fair minded finder of fact to make the finding under review. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005). In making this determination, we must credit favorable evidence if a reasonable finder of fact could, and disregard contrary evidence unless a reasonable finder of fact could not. *See id.* The finder of fact is the sole judge of the credibility of the witnesses and the weight to be assigned to their testimony. *See id.* at 819. The finder of fact is free to believe one witness and disbelieve another, and reviewing courts may not impose their own opinions to the contrary. *See id.* Accordingly, reviewing courts must assume that the finder of fact decided all credibility questions in favor of the verdict if a reasonable person could do so. *See id.* If a reasonable finder of fact could have done so, we must assume that the finder of fact chose what testimony to disregard in a way that was in favor of the verdict. *See id.* at 820. A finder of fact "may disregard even uncontradicted and unimpeached testimony from disinterested witnesses" where reasonable. *See id.* at 819–20.

In addition, it is within the finder of fact's province to resolve conflicts in the evidence. *See id.* at 820. Consequently, we must assume that, where reasonable, the finder of fact resolved all conflicts in the evidence in a manner consistent with the verdict. *See id.* Where a reasonable finder of fact could resolve conflicting evidence either way, we must presume the finder of fact did so in favor of the verdict. *See id.* at 821. Where conflicting inferences can be drawn from the evidence, it is within the province of the finder of fact to choose which inference to draw, so long as more than one inference can reasonably be drawn. *See id.* Therefore, we must assume the finder of fact made all inferences in favor of the verdict if a reasonable person could do so. *See id.*

Regarding factual sufficiency challenges, when the party who had the burden of proof on an issue in a bench trial complains about the absence of a finding of fact by the trial court, we treat the absence of the finding as a refusal by the trial court to find the fact from a preponderance of the evidence. *Santa Fe Petroleum, L.L.C. v. Star Canyon Corp.*, 156 S.W.3d 630, 637 (Tex.App.-Tyler 2004, no pet.) (citing *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989)). When the party who had the burden of proof on an issue asserts that the trial court's refusal to find the fact is contrary to the evidence, we must overrule the complaint unless, considering all the evidence, the refusal is so contrary to the great weight and preponderance of the evidence that it is manifestly unjust. *See Ramsey v. Lucky Stores, Inc.*, 853 S.W.2d 623, 632 (Tex.App.-Houston [1st Dist.] 1993, writ denied) (citing *Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 649 (Tex. 1988)).

When reviewing factual sufficiency issues arising from a bench trial, we must remember that the trial court, as the trier of fact, is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Santa Fe Petroleum*, 156 S.W.3d at 638. The trial court may take into consideration all of the facts and sur-

rounding circumstances in connection with the testimony of each witness and accept or reject all or any part of that testimony. *Id.* Where enough evidence is before the trial court so that reasonable minds could differ on the meaning of the evidence, or the inferences and conclusions to be drawn from the evidence, we may not substitute our judgment for that of the trial court. *Id.*

### Discussion

 It is undisputed that Mullinax was not contacted before the initial tow was conducted. Also, it is axiomatic that Mullinax's subsequent consent to later tows does not relate back in time and render the initial tow consensual. Therefore, the only disputed question of fact before the trial court was whether Sweeney gave consent to conduct the initial tow.

Neither Sweeney nor Mullinax testified at trial. Hopkins testified that he did not speak with Sweeney before the initial tow. The only remaining possibility is that Sweeney could have consented to the tow by expressing his consent to Trooper Faulkner. The sole witness at trial regarding this possible consent was Trooper Faulkner. He testified as follows:

Q All right. And did you learn who the owner of the vehicle [that] was involved in that collision was when you arrived?

A Yes, sir.

Q How did you learn that?

A I believe that I spoke to him briefly before he went to the hospital.

Q Him being who?

A Mr. Henry Sweeney.

. . . .

Q At the time, did you have any conversation with him regarding [the] disposition he wanted made of the truck or trailer?

A I don't recall.

. . . .

Q Did he ever indicate to you his desire that anything in particular be done with the truck and trailer?

A Not to my knowledge.

. . . .

Q Do you know how [Hopkins] was called to the scene?

A I believe at that time I did. Or had somebody call him.

. . . .

Q Did you ever talk to the owner of the truck, a Mr. Paul Mullinax?

A I can't recall.

Q Did anyone, to your knowledge, ever call you and give you instructions as to what they wanted done with this truck and trailer if it was removed?

A Not to my knowledge.

. . . .

Q [D]id you discuss [the fact that the truck had rolled onto its side] with [Sweeney] and did he seem to be aware that the truck was turned over? Did he seem to be aware of that?

A I don't know about turned over, but he knew he was in [a] wreck.

Q Did he seem to understand the truck was going to have to be towed?

A Yes.

Q Did you tell him the truck was going to be towed?

A I usually ask the driver of the truck, did you have a preference. But on 18–wheelers most of them are from out of town. I'm sure I asked him who he wanted.

Q Okay. So you recall a conversation with Sweeney about the truck was going to have to be towed? We have to get something done here, correct?

A Yes, sir.

Q And he agreed to that?

A I'm sure he did.

. . . .

Q I'm not sure I understood. Do you have any recollection if Mr. Sweeney ever discussed with you who would tow that truck or how would it be towed or anything of that nature?

A Not specifically. This is two years ago.

. . . .

Q You are saying you may be recalling another wreck involving a roll over?

A Yes, sir. And it is confusing me.

. . . .

Q And from what you're saying, again based on recollection, when you did talk to Mr. Sweeney at the scene he understood the tractor-trailer was going to be towed? It was crystal clear to you and everybody else [that] he wasn't getting in it and neither was any other truck driver going to get in it and drive it away?

A Yes.

Q You don't recall him saying, no, I can't do anything. I have to talk to somebody or do something special? You don't remember that?

A No, sir.

Trooper Faulkner gave conflicting testimony about whether he recalled Sweeney's expressing a consent to tow. Because this was a bench trial, it was within the trial court's province to resolve this conflict in the evidence. *See City of Keller,* 168 S.W.3d at 820. Because a reasonable finder of fact could have resolved this conflicting evidence in favor of a nonfinding of consent, we must presume the trial court did so. *See id.* at 821. Therefore, after reviewing the record, we conclude that the evidence at trial was sufficient to enable a reasonable and fair minded finder of fact to make a nonfinding of consent. As such,

the evidence was legally sufficient to support the nonfinding. *See id.* at 827.

Because reasonable minds could differ on the conclusions to be drawn from Sweeney's testimony, we may not substitute our judgment for that of the trial court. *See Santa Fe Petroleum,* 156 S.W.3d at 638. After considering all the evidence, we conclude that the trial court's refusal to find that the tow was consensual was not contrary to the great weight and preponderance of the evidence. Therefore, the evidence was factually sufficient to support the trial court's nonfinding of consent. *See Ramsey,* 853 S.W.2d at 632.

Having held that the evidence supporting the trial court's nonfinding of consent was based on legally and factually sufficient evidence, we overrule Canal's first issue.

### TOTAL LOSS

■ In its second issue, Canal challenges the legal sufficiency of the evidence supporting the trial court's written finding of fact that Canal had paid "a claim of total loss on a vehicle." Specifically, Canal claims that there was "no evidence that Canal paid 'a claim of total loss.'" It is undisputed that Canal paid an insurance claim to Mullinax for the damage to the tractor and trailer. Likewise, Canal does not challenge the following pertinent findings of fact made by the trial court:

16. The estimated fair market value of the truck prior to the wreck was $10,000, while the estimated cost to repair was $10,687.17.

17. The estimated fair market value of the trailer prior to the wreck was $9,125.00, while the estimated cost to repair was $11,509.20.

Unchallenged findings of fact, absent fundamental error, are not subject to appellate review and must be accepted by an appellate court as proven facts. *See Love-*

*joy v. Lillie,* 569 S.W.2d 501, 504 (Tex.Civ. App.-Tyler 1978, writ ref'd n.r.e.) (op. on reh'g). Therefore, the only question for review is whether evidence that repair costs will exceed the fair market value of the property to be repaired constitutes legally sufficient evidence of a total loss.[3]

### Standard of Review

█ Whether property is a "total loss" is a question of fact. *See Crutchfield v. St. Paul Fire & Marine Ins. Co.,* 306 S.W.2d 948, 951 (Tex.Civ.App.-Fort Worth 1957, no writ) (addressing the issue of total loss as a question of fact). When we review a legal sufficiency challenge to written findings of fact, the standard of review is the same as that applied to a jury's verdict upon jury questions. *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994). As stated above, when reviewing a finding of fact for legal sufficiency, we may set aside a finding of fact only if the evidence at trial would not enable a reasonable and fair minded finder of fact to reach the finding under review. *See City of Keller,* 168 S.W.3d at 827. In making this determination, we must credit favorable evidence if a reasonable finder of fact could, and disregard contrary evidence unless a reasonable finder of fact could not. *See id.*

### Discussion

█ Property is a total loss if a reasonably prudent uninsured owner, desiring to restore the property to its preincident condition, would not utilize that property for such restoration. *See State Farm Fire & Cas. Co. v. Mower,* 917 S.W.2d 2, 4 (Tex.1995); *Glens Falls Ins. Co. v. Peters,* 386 S.W.2d 529, 531 (Tex.1965); *Royal Ins. Co. v. McIntyre,* 90 Tex. 170, 182, 37 S.W. 1068, 1074 (1896). Logic dictates that, absent other factors, a reasonably prudent uninsured owner would not repair a vehicle where the repair costs exceeded the vehicle's preincident fair market value.

Here, the trial court made findings of fact that the cost of repairing the tractor and trailer exceeded the fair market value of those items. In contrast, there was evidence at trial that showed Mullinax wanted to retain title to the tractor and trailer and that he hoped to repair them. However, absent any specifics as to why Mullinax thought such a course to be prudent, and in the context of the excessive cost to repair, the trial court was free to disregard this evidence as an unreasonable idea that would not comport with the ideas of a reasonable uninsured owner. *See City of Keller,* 168 S.W.3d at 827. We note that Canal employee Ron King testified that he did not pay a claim of total loss because he

**3.** In its motion for rehearing, Canal, for the first time, contests the trial court's finding of fact that the preincident fair market value of the tractor was $10,000. The sole purpose of a motion for rehearing is to provide the appellate court an opportunity to correct any errors on issues already presented. *Phifer v. Nacogdoches County Cent. Appraisal Dist.,* 45 S.W.3d 159, 166 (Tex.App.-Tyler 2000, pet. denied). A motion for rehearing does not afford a party an opportunity to raise new issues. *Id.* Therefore, we do not address this complaint.

Canal's second issue is a "no evidence" issue, which, without further explanation, could be construed to encompass a complaint about the basis of the trial court's $10,000

fact finding. However, in the briefing of its second issue, Canal did not attack any of the trial court's separate findings of fact underlying the trial court's "total loss" finding. Instead, Canal argued that the evidence, taken as a whole, had only one reasonable interpretation. Under these circumstances, it would be inappropriate to read a complaint as to the $10,000 finding into Canal's second issue. Canal concedes as much by failing to argue, in its motion for rehearing, that such a complaint was one of the issues presented in its brief or reply brief. By failing to argue any connection to its original issues, Canal merely seeks appellate review of a new and previously unpresented issue. Such a review is beyond the scope of rehearing. *See id.*

does not consider a vehicle that can be repaired to be a total loss. Nonetheless, King's personal definition of total loss was irrelevant because it did not comport with the definition of total loss that has been consistently applied by the Texas Supreme Court. *See Mower,* 917 S.W.2d at 4; *Peters,* 386 S.W.2d at 531; *McIntyre,* 90 Tex. at 182, 37 S.W. at 1074. Therefore, because the trial court's findings of fact relating to fair market value and repair cost have not been challenged, we conclude that the evidence of fair market values and costs to repair was sufficient evidence to enable a reasonable and fair minded finder of fact to find that the tractor and trailer were a total loss. Thus, the evidence was legally sufficient to support the finding. *See City of Keller,* 168 S.W.3d at 827. We overrule Canal's second issue.

### LIEN

In its third issue, Canal argues that the Texas Occupations Code does not create a lien against insurance settlement funds. A review of the record shows that the trial court's judgment was not based upon a conclusion that the Occupations Code created any such lien. We overrule Canal's third issue.

### STATUTORY INTERPRETATION

In its fourth issue, Canal claims that the trial court erroneously interpreted section 2303.156(b) of the Texas Occupations Code. In its fifth and sixth issues, Canal claims that section 2303.156(b) is unconstitutionally vague.

### Standard of Review & Method of Interpretation

The interpretation of a statute is a question of law. *In re Canales,* 52 S.W.3d 698, 701 (Tex.2001) (orig.proceeding). Therefore, we review a trial court's interpretation of a statute de novo. *See Smith v. Smith,* 22 S.W.3d 140, 149 (Tex.App.-Hous-

ton [14th Dist.] 2000, no pet.). When performing a de novo review, we exercise our own judgment and redetermine each legal issue. *Quick v. City of Austin,* 7 S.W.3d 109, 116 (Tex.1999). We will uphold conclusions of law on appeal if the judgment can be sustained on any legal theory the evidence supports. *Waggoner v. Morrow,* 932 S.W.2d 627, 631 (Tex.App.-Houston [14th Dist.] 1996, no writ).

The Texas Code Construction Act governs the interpretation of "each code enacted by the 60th or a subsequent legislature as part of the state's continuing statutory revision program." TEX. GOV'T CODE ANN. § 311.002(1) (Vernon 2005). Section 2303.156(b) is part of such a code. *See* TEX. OCC.CODE ANN. § 1.001 (Vernon 2004). Therefore, we must apply the methods of interpretation set forth in the Code Construction Act to section 2303.156(b). *See* TEX. GOV'T CODE ANN. § 311.002(1).

The fundamental rule governing the construction of a statute is to ascertain the intent of the legislature in enacting the statute. *Brown v. Owens,* 674 S.W.2d 748, 750 (Tex.1984). Under the Code Construction Act, when interpreting a statute, we must begin with the presumption that the legislature intended that the statute (1) comply with the United States and Texas constitutions, (2) be effective in its entirety, (3) produce a "just and reasonable result," and (4) produce "a result feasible of execution." *See* TEX. GOV'T CODE ANN. § 311.021 (Vernon 2005). Likewise, we must also presume that the legislature, "[i]n enacting [the] statute," favored "public interest ... over any private interest." *See id.*

Under the Act, when "construing a statute ... a court may consider[,] among other matters[,] the:

(1) object sought to be attained;

(2) circumstances under which the statute was enacted;

(3) legislative history;

(4) common law or former statutory provisions, including laws on the same or similar subjects;

(5) consequences of a particular construction;

(6) administrative construction of the statute; and

(7) title (caption), preamble, and emergency provision."

TEX. GOV'T CODE ANN. § 311.023 (Vernon 2005). Consideration of these matters is appropriate even where a statute is not considered ambiguous on its face. *Id.; Fleming Foods of Tex., Inc. v. Rylander,* 6 S.W.3d 278, 283 (Tex.1999). "Words and phrases shall be read in context and construed according to the rules of grammar and common usage." TEX. GOV'T CODE ANN. § 311.011(a) (Vernon 2005). However, where "[w]ords and phrases ... have acquired a technical or particular meaning, whether by legislative definition or otherwise, [they] shall be construed accordingly." TEX. GOV'T CODE ANN. § 311.011(b) (Vernon 2005).

While we must apply the Act's presumptions regarding legislative intent, *see* TEX. GOV'T CODE ANN. § 311.021, we are free to hold, where appropriate, that those presumptions have been rebutted. *Cf. Phoenix Founders, Inc. v. Marshall,* 887 S.W.2d 831, 835 (Tex.1994) (orig.proceeding) (holding that a presumption of unethical conduct could be rebutted). Also, while we may consider matters such as legislative history, "[w]e must construe statutes as written and, if possible, ascertain legislative intent from the statute's language." *Helena Chem. Co. v. Wilkins,* 47 S.W.3d 486, 493 (Tex.2001). Finally, "we must always consider the statute as a whole rather than its isolated provisions." *Id.*

When statutes are subject to construction, it is not within the judicial province to indulge in acts of legislation. Courts may direct the attention of the lawmakers to a defect or omission in a statute, but they must take the statutes as they find them. It is for the legislature, not the courts, to remedy defects or supply deficiencies in laws, and to give relief from unjust and unwise legislation. Accordingly, a court is not authorized, under any pretext, to modify, repeal, or rewrite[ ] a statute or even to construe an unambiguous act to conform to its own notions of justice, policy, propriety, or wisdom.

67 TEX. JUR. 3d *Statutes* § 85 (2003) (internal citations omitted).

### *Interpretation of Section 2303.156(b)*

Section 2303.156(b) reads as follows:

An insurance company that pays a claim of total loss on a vehicle in a vehicle storage facility is liable to the operator of the facility for any money owed to the operator in relation to delivery of the vehicle to or storage of the vehicle in the facility regardless of whether an amount accrued before the insurance company paid the claim.

TEX. OCC.CODE ANN. § 2303.156(b). Canal claims that the legislative history of section 2303.156 shows the legislature intended that section to be interpreted in a manner that would impose monetary liability upon an insurer only where there has been a post-tow transfer of title of the towed vehicle to the insurer. Canal buttresses this argument by asserting that sections of the Texas Administrative Code support such an interpretation. Canal also argues that the trial court interpreted the phrase "total loss" in a way unintended by the legislature, alleging that the legislative history shows the legislature considered the phrase "total loss" to mean a vehicle that

was "without value." Finally, Canal asserts that the legislature intended section 2303.156(b) to apply only where an insurance company "abandons" a vehicle and "the facility operator is left to his own resources to collect the costs incurred."

### Transfer of Title

■ Section 2303.156(b) clearly and unambiguously renders an insurance company liable for towing fees to the operator of a vehicle storage facility regarding vehicles for which the insurance company has paid a claim of total loss. *See id.* The statute does not exempt insurance companies that have, for whatever reason, failed to obtain title to the vehicle. *See id.* Nonetheless, Canal claims that the statute's legislative history supports the proposition that such an exemption was intended. We disagree. While the legislative history contains some supporting language, the unambiguous language of the statute contradicts that language. Further, no provision of the Texas Administrative Code cited by Canal, in either the then existing or the current version, directly relates to the question of insurance company liability addressed by section 2303.156(b). *See* 43 TEX. ADMIN. CODE. §§ 18.87, 18.90, 18.92, 18.96 (West, Westlaw, current through the date of this opinion) (Tex. Dep't of Transp., Vehicle Storage Facilities).[4]

The most clear support for Canal's proposition can be found in the following statement made by Senator Jerry Patterson:

> House Bill 2516 allows vehicle storage facilities to be compensated for their towing and storage fees, if a vehicle is totaled.... This will allow, *after the title has been transferred to the insurance company*, the towing and storage lot folks to be reimbursed by the insurance company for their towing and storage fees.

Hearing on Tex. H.B. 2516 Before the Senate Comm. on Jurisprudence, 74th Leg., R.S., p. 11 of Ex. C to Canal's Brief (May 23, 1995) (transcript available from Legislative Intent Research, Austin, Texas) (emphasis added). However, neither the full House or Senate ever discussed this issue. Therefore, it is impossible to fully discern the intent of the legislature as a whole. Instead, we are presented with a statement one senator made in committee. Even if the Senate committee considering section 2303.156(b) meant for the statute to apply only "after the title has been transferred to the insurance company," we are still faced with the question whether the full Senate also had such an intent. This question is better answered by unambiguous statutory language rather than legislative history. *See Fleming Foods*, 6 S.W.3d at 284 ("[L]egislative history cannot be used to alter or disregard the express terms of a code provision when its meaning is clear from the code when considered in its entirety, unless there is an error such as a typographical one.").

■ It is a cardinal rule of statutory construction that we are to give effect to the intent of the legislature. *Id.* But isolated statements by individual legislators must be weighed against the clear language used in section 2303.156(b). *See id.* This unambiguous statute is the law of Texas and should not be construed by this court to mean something other than what the plain words say absent an obvious error, such as a typographical one resulting in the omission of a word, or where application of its literal language would produce an absurd result. *See id.* "Courts are not responsible ... for omissions in legislation, but only for giving a true and fair interpretation of the enact-

---

4. For simplicity, we have cited only the current version of these sections.

ment as it is written, which means an interpretation that is not exaggerated, forced, or strained but one the ordinary meaning of the words of the enactment will fairly sanction and clearly sustain." *Comm'rs Ct. of Caldwell County v.Crim. Dist. Att'y, Caldwell County*, 690 S.W.2d 932, 936 (Tex.App.-Austin1985, writ ref'd n.r.e.) (citing *R.R. Comm'n of Tex. v. Miller*, 434 S.W.2d 670, 672 (Tex.1968)). Instead, "every word excluded from a statute must ... be presumed to have been excluded for a purpose." *Sw. Bell Tel. Co. v. Pub. Util. Comm'n of Tex.*, 79 S.W.3d 226, 229 (Tex.App.-Austin 2002, no pet.) (quoting *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex.1981)). Because we have discerned no obvious textual mistake, we cannot hold that the trial court erred by concluding that section 2303.156(b) was not limited to instances where "title has been transferred to the insurance company." Further, while the trial court's interpretation of this statute may be considered unwise by Canal, the result of that interpretation, which follows the statute's plain text, was not "absurd."

**Total Loss**

 Section 2303.156(b) applies to instances where "[a]n insurance company ... pays a claim of total loss on a vehicle." According to Canal, the legislative history shows that the legislature intended the phrase "total loss" to apply only "in such cases where the vehicle is without value." Again, we disagree. On the whole, the legislative history reflects a concern by legislators regarding whether the interest acquired under section 2303.156(b) would be superior to the interest possessed by secured lenders. *See, e.g.*, Debate on Tex. H.B. 2516 on the Floor of the House, 74th Leg., R.S., p. 10 of Ex. C to Canal's Brief (May 10, 1995) (transcript available from Legislative Intent Research, Austin, Texas) ("KING: Does that ... essentially

mean that a storage facility has a superior lien to the bank?"). The fact that a major consideration of the legislature was about who would have a superior interest in the affected vehicles shows that the legislature was, as a whole, unlikely to be under the impression that these vehicles would be "without value." Instead, the legislative history shows that they considered the phrase "total loss" to be consistent with the word "totaled." *See* Hearing on Tex. H.B. 2516 Before the Senate Comm. on Jurisprudence, 74th Leg., R.S., p. 11 of Ex. C to Canal's Brief (May 23, 1995) ("House Bill 2516 allows vehicle storage facilities to be compensated for their towing and storage fees, if a vehicle is *totaled*. Essentially, the problem arises when a vehicle is ... determined to be a *total loss*. ..." (emphasis added)).

It is commonly understood that "totaled" vehicles are those for which repairs would be too costly compared to the value of the vehicle. *See, e.g., Evans v. State*, No. 03–01–00013–CR, 2001 WL 838189, at *3 n. 3 (Tex.App.-Austin July 26, 2001, no pet.) (not designated for publication). This comports with the Texas Supreme Court's definition of "total loss." *See Mower*, 917 S.W.2d at 4; *Peters*, 386 S.W.2d at 531; *McIntyre*, 90 Tex. at 182, 37 S.W. at 1074. As stated above, a "total loss" has been defined by the Texas Supreme Court to occur in situations where a reasonably prudent uninsured owner, desiring to restore the property to its preincident condition, would not utilize that property for such restoration. Generally, a reasonably prudent uninsured owner would not repair a vehicle where the repair costs exceeded the vehicle's preincident fair market value. Therefore, a "totaled" vehicle would also be a "total loss."

 Unless a contrary intent is clearly shown, the legislature is presumed to have

enacted new or revised statutes with knowledge of the existing state of the law and with the intent that the new law be subject to the old. *Twin City Fire Ins. Co. v. Cortez,* 576 S.W.2d 786, 789 (Tex. 1978). The Texas Supreme Court has consistently defined and interpreted the term "total loss" for over 100 years. *See, e.g., Mower,* 917 S.W.2d at 4; *Peters,* 386 S.W.2d at 531; *McIntyre,* 90 Tex. at 182, 37 S.W. at 1074. This definition does not require that the property be without value; it merely requires that a reasonably prudent uninsured owner, desiring to restore the property to its preincident condition, would not utilize that property for such restoration. *See id.* Further, such a definition also comports with the word "totaled." Bearing in mind this consistent definition of "total loss" and the presumption that the legislature enacted section 2303.156(b) with the intent that it be subject to older law (here, the consistent definition of "total loss"), we hold that, under section 2303.156(b), a "total loss" occurs whenever the repair costs of a vehicle exceed the vehicle's preincident fair market value. The trial court concluded that "Mullinax's truck and trailer were a 'total loss' because the cost of repair of the damages to them was equal to, or in excess of, their fair market value at the time of the loss." The trial court did not err in its interpretation of "total loss."

### Abandonment

■ Finally, Canal asserts that the legislature intended section 2303.156(b) to apply only to situations where an insurance company "abandons" a vehicle and "the facility operator is left to his own resources to collect the costs incurred." The statute in question contains no language requiring that an insurance company actually abandon a vehicle. Further, the legislative history supports a slightly different intent:

[S]ometimes [vehicle owners] just abandon the vehicles and [the storage facility does not] have room for anything else and nobody ever claims [the vehicle]. That's what [section 2303.156(b) ] is intended to address.

Debate on Tex. H.B. 2516 on the Floor of the House, 74th Leg., R.S., p. 9 of Ex. C to Canal's Brief (May 10, 1995).

Essentially, the problem arises when a vehicle is . . . a total loss, but has been towed and . . . stowed by [a storage] facility . . . and then no one comes to get it . . . neither the owner nor the insurance company.

Hearing on Tex. H.B. 2516 Before the Senate Comm. on Jurisprudence, 74th Leg., R.S., p. 11 of Ex. C to Canal's Brief (May 23, 1995).

Here, Canal paid "a claim of total loss." Neither Mullinax, the owner, or Canal, the insurer, "[came] to get" the vehicles in question. Hopkins was, thus, faced with the proposition of never receiving payment for the towing charges related to the vehicles. The legislative history supports the conclusion that this was the exact factual situation that the statute in question was enacted to remedy. Therefore, we hold that the trial court did not err by concluding that "Canal [could be held] liable . . . to pay [Hopkins's] charges for towing Mullinax's truck and trailer."

### Vagueness

In its fifth issue, Canal asserts that section 2303.156(b) of the Texas Occupations Code is unconstitutionally vague because the statute does not define the term "total loss." In its sixth issue, Canal argues that section 2303.156(b) of the Texas Occupations Code is unconstitutionally vague because it does not contain language restricting the liability of an insurer to instances where there has been a post-tow transfer

of title to the towed vehicle from the insured to the insurer.

 A statute is unconstitutionally vague if the persons regulated by it are exposed to risk or detriment without fair warning or if it invites arbitrary and discriminatory enforcement. *See Comm'n for Lawyer Discipline v. Benton*, 980 S.W.2d 425, 437 (Tex.1998). We scrutinize civil statutes less severely than criminal statutes because the consequences of imprecision are not as severe. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). A statute is not unconstitutionally vague unless it would require people of common intelligence to guess at its meaning or there is a substantial risk of miscalculation by those whose acts are subjected to regulation. *See Tex. Liquor Control Bd. v. Attic Club, Inc.*, 457 S.W.2d 41, 45 (Tex.1970).

### Total Loss

 "[T]he mere fact that the parties disagree as to [the statute's] meaning does not mean we must necessarily guess at its meaning." *Mills v. Fletcher*, 229 S.W.3d 765, 770 (Tex.App.-San Antonio 2007, no pet.). Once again, unless a contrary intent is clearly shown, the legislature is presumed to have enacted new or revised statutes with knowledge of the existing state of the law and with the intent that the new law be subject to the old. *Twin City Fire Ins.*, 576 S.W.2d at 789. The Texas Supreme Court has consistently defined and interpreted the term "total loss" for over 100 years. *See, e.g., Mower*, 917 S.W.2d at 4; *Peters*, 386 S.W.2d at 531; *McIntyre*, 90 Tex. at 182, 37 S.W. at 1074. Bearing in mind this consistent definition of "total loss" and the presumption that the legislature enacted section 2303.156(b) with the intent that it be subject to older law (here, the consistent definition of "total

loss"), we determine that people of common intelligence would not be required to guess at the meaning of the statute and that there is not a substantial risk of miscalculation by those whose acts are subjected to regulation. Therefore, we hold that the phrase "total loss" found in section 2303.156(b) is not unconstitutionally vague. *See Attic Club*, 457 S.W.2d at 45.

### Transfer of Title

 Section 2303.156(b) clearly and unambiguously renders an insurance company liable, for towing fees, to the operator of a vehicle storage facility, regarding vehicles for which the insurance company has paid a claim of total loss. *See* Tex. Occ. Code Ann. § 2303.156(b). The statute does not exempt insurance companies who have, for whatever reason, failed to obtain title to the vehicle. *See id.* Therefore, we cannot hold that the omission of Canal's proposed requirement makes the statute unconstitutionally vague. Because people of common intelligence would not be required to guess at the meaning of this statute, and because there is not a substantial risk of miscalculation by those whose acts are regulated by it, we hold that section 2303.156(b) is not unconstitutionally vague. *See Attic Club*, 457 S.W.2d at 45.

### Conclusion

Having determined that the trial court did not err in its interpretation of section 2303.156(b), we overrule Canal's fourth issue. Because we have determined that section 2303.156(b) is not unconstitutionally vague, we overrule Canal's fifth and sixth issues.

### IMPAIRMENT OF CONTRACTUAL OBLIGATIONS

 In its seventh issue, Canal complains that the trial court's interpretation of section 2303.156(b) is unconstitutional

under the Contracts Clause found in article I, section 10 of the United States Constitution. In pertinent part, article I, section 10 provides that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts...." U.S. CONST. art I, § 10, cl. 1. The constitutionality of a trial court's interpretation of a statute is a question of law. *See Griggs v. State,* 99 S.W.3d 718, 721 (Tex.App.-Houston [1st Dist.] 2003, pet. ref'd). Therefore, we will conduct our review de novo. *See Smith,* 22 S.W.3d at 149.

 Canal claims that the trial court's interpretation of section 2303.156(b) is, in and of itself, an unconstitutional impairment of Canal's insurance contract obligations.[5] Therefore, the question before us is whether a judicial interpretation of a statute can constitute, in and of itself, law impairing the obligation of a contract.[6] This question must be answered in the negative.

 The Contracts Clause of article I, section 10 is directed only against impairment by legislation, and not against the judgments of courts. *Barrows v. Jackson,* 346 U.S. 249, 260, 73 S.Ct. 1031, 1037, 97 L.Ed. 1586 (1953); *Fleming v. Fleming,* 264 U.S. 29, 31–32, 44 S.Ct. 246, 247, 68 L.Ed. 547 (1924); *see* U.S. CONST. art I, § 10, cl. 1. Therefore, as a matter of law, the trial court's interpretation of section 2303.156(b) could not violate the Contracts Clause. *See id.* We overrule Canal's seventh issue.

5. Canal, in its brief, initially argued that section 2303.156(b), as applied, unconstitutionally impaired the contractual obligations of the insurance contract between it and Mullinax by requiring "Canal to pay ... insurance benefits to an unrelated [third] party claimant (Hopkins) or [by] otherwise [requiring] Canal to make payments beyond the scope of its insurance agreement with [Mullinax] and beyond its already exhausted policy limits and without effective notice procedures." Hopkins responded, stating in his brief that

Canal's argument that its contract rights are constitutionally impaired by [section 2303.156(b)] ignores the plain fact that[,] when it contracts to do business in Texas[,] it agrees to operate under the laws of [Texas]. The State of Texas has adopted laws that were in force when Canal chose to sell a policy of insurance to a truck owner and operator[, Mullinax,] who transported goods in Texas. What Canal claims is that it should be able to issue a policy of insurance to an insured who does business in Texas, but not be bound to comply with the laws of [Texas]. Texas has long recognized the rule that "[t]he laws ... existing at the time a contract is made[ ] become part of the contract." (citations omitted).

In response to Hopkins, Canal, in its reply brief, refined its issue. Canal stated

Hopkins brazenly claims that Canal fails to recognize that it must operate under the laws of the State of Texas. Hopkins is mistaken. Canal understands that it must comply with Texas law. Canal has never argued that the laws of the state should not be properly applied.

Canal went on to explain that its assertion was that the trial court has incorrectly interpreted section 2303.156(b). According to Canal, "[t]he plain fact is [that section 2303.156(b)] was not designed or intended for a case like this." We, therefore, have determined that Canal has not presented us with the question of section 2303.156(b)'s constitutionality under the Contracts Clause. Instead, Canal has presented us with the question of whether the trial court's interpretation was, in and of itself, an unconstitutional impairment of Canal's insurance contract obligations.

6. To the extent that Canal has mentioned any previously unconsidered arguments as to possible errors made by the trial court in interpreting the statute in question, Canal has either failed to provide citation to the record or authority or failed to provide substantive argument. Therefore, Canal has failed to present the arguments for appellate review. *See Strange v. Cont'l Cas. Co.,* 126 S.W.3d 676, 678 (Tex.App.-Dallas 2004, pet. denied); *see also* TEX.R.APP. P. 38.1(h). Further, all of these arguments are contradicted by either the facts of the case or by the unambiguous text of the statute in question. As such, even were we to base our holding on the merits of these arguments, the result would not change.

## TAKING OF PROPERTY

In its eighth and ninth issues, Canal argues that section 2303.156(b), as applied, resulted in the unconstitutional taking of money from Canal and the awarding of that money to Hopkins in violation of the takings protections found in the Fifth Amendment to the United States Constitution and article I, section 17 of the Texas Constitution. The money addressed here is the amount necessary to satisfy the trial court's judgment against Canal for the towing fees in question.

### Standard of Review

■ The determination of whether a statute violates a constitution is a question of law, and thus is reviewed de novo. *See State v. Operating Contractors,* 985 S.W.2d 646, 650–51 (Tex.App.-Austin 1999, pet. denied).

### Federal Takings Claim

■ The Takings Clause of the Fifth Amendment to the United States Constitution provides that "private property [shall not] be taken for public use, without just compensation." U.S. CONST. amd. V. The clause "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). It was made applicable to state governments by the Fourteenth Amendment. *Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 122, 98 S.Ct. 2646, 2658, 57 L.Ed.2d 631 (1978). It protects not only persons, but corporations as well. *See, e.g., E. Enters. v. Apfel,* 524 U.S. 498, 538, 118 S.Ct. 2131, 2153, 141 L.Ed.2d 451 (1998) (plurality op.) (holding that an unconstitutional taking of a corporation's property had occurred).

■ The Takings Clause is concerned with government taking of "private property." *See* U.S. CONST. amd. V. Therefore, we begin our inquiry with two questions: (1) is the item in question "property" and, (2) if it is property, is it "private property." *See id.* "Property interests ... are not created by the Constitution." *Bd. of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Instead, they are created, and their dimensions are defined, by existing rules or understandings that stem from an independent source, such as state law. *Id.*

■ Money is "property" under Texas law. *See Norris v. City of Waco,* 57 Tex. 635, 643 (1882). Further, it is uncontested that the money awarded Hopkins under the judgment in question was Canal's money and that Canal is not a public entity. Therefore, we conclude that the money awarded to Hopkins was Canal's "private property" within the meaning of the Takings Clause. *See Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. As such, we must now determine if the money was "taken" within the meaning of the Clause. *See, e.g., Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1004, 104 S.Ct. 2862, 2873–74, 81 L.Ed.2d 815 (1984).

■ The question whether property has been "taken" is "essentially [an] ad hoc, factual inquir[y]." *Penn Cent. Transp.,* 438 U.S. at 124, 98 S.Ct. at 2659. In the context of a law such as section 2303.156(b), we must consider the three factors set forth in *Penn Central Transportation Company v. City of New York. See Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528, 537–38, 125 S.Ct. 2074, 2081, 161 L.Ed.2d 876 (2005). According to *Penn Central,* when determining if a taking has occurred, we should consider (1) "the economic impact of the [law] on the claimant"; (2) "the extent to which the [law] has

interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action." *See Penn Cent. Transp.*, 438 U.S. at 124, 98 S.Ct. at 2659.

*Penn Central* "provides important guideposts that lead to the ultimate determination [of] whether just compensation is required." *Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 672 (Tex. 2004) (quoting *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 326–27 n. 23, 122 S.Ct. 1465, 1481 n. 23, 152 L.Ed.2d 517 (2002)). Nonetheless, "these factors do not comprise a formulaic test." *Sheffield Dev.*, 140 S.W.3d at 672. Instead, these factors "aim[ ] to identify [government] actions that are functionally equivalent to the classic taking in which government directly appropriates private [real] property or ousts the owner from his domain." *Lingle*, 544 U.S. at 539, 125 S.Ct. at 2082. Finally, in some instances, the force of one of the *Penn Central* factors may be so overwhelming that it is dispositive of whether a taking has occurred. *See, e.g., Ruckelshaus*, 467 U.S. at 1005, 104 S.Ct. at 2874.

### Economic Impact

According to Canal,
[t]he economic impact on Canal . . . is substantial. Canal[ ] is an insurance company that currently does not write . . . coverage for towing or storage. The trial court's application of [section 2303.156(b) ] demands that Canal pay towing and storage costs for each of the vehicles it insures while not collecting any premium as compensation. This is an unconscionable result. . . .

We note that Canal has not addressed the number of vehicles for which Canal pays a claim of total loss yearly, how many of those vehicles fall within the grasp of Texas law, or the actual cost Canal would incur yearly as a result. The only econom-ic impact that can be quantified is the amount awarded to Hopkins in the judgment in question, $12,690.00, plus prejudgment interest and court costs. However, we will assume, arguendo, that the economic impact upon Canal, a nationwide insurer of commercial carriers, is "substantial."

### Investment–Backed Expectations

We now turn to "the extent to which [section 2303.156(b) ] has interfered with distinct investment-backed expectations." *See Penn Cent. Transp.*, 438 U.S. at 124, 98 S.Ct. at 2659. When considering this factor, we must determine if the expectations in question were reasonable. *See Ruckelshaus*, 467 U.S. at 1005, 104 S.Ct. at 2874. In this regard, a "reasonable investment-backed expectation" must be more than a "unilateral expectation or an abstract need." *Id.*

Canal argues that
Canal, like all private companies and individuals, relies heavily on constitutionally guaranteed notions of liberty, protection of personal property, and freedom of contract. Here, Canal's reliance that it could enter into a contractual relationship clearly defining its obligations regarding insurance coverage for vehicles without interference from the State or a third party was reasonable. The trial [c]ourt's ruling, however, results in the State . . . actually depriving Canal of its property.

In short, Canal argues it had a reasonable investment backed expectation that has been fully interfered with by government.

In the course of regulating commercial and other human affairs, legislatures routinely create burdens for some that directly benefit others. *See, e.g., E. Enters.*, 524 U.S. at 526, 118 S.Ct. at 2148. In this regard, "legislation is not unlawful

solely because it upsets otherwise settled expectations." *Id.* Therefore, we must evaluate the reasonableness of Canal's expectations in the context of the industry in which it operates. *See Ruckelshaus,* 467 U.S. at 1005, 104 S.Ct. at 2874.

■ The "insurance [industry] affects a great many people, is subject to substantial governmental regulation[,] and is stamped with a public interest." *Eckenrode v. Life of Am. Ins. Co.,* 470 F.2d 1, 5 (7th Cir.1972); *see Linick v. Employers Mut. Cas. Co.,* 822 S.W.2d 297, 299–300 (Tex.App.-San Antonio 1991, no writ). The organization of an insurance company and the conduct of the business of writing insurance is not a right but a privilege granted by the states, subject to the conditions imposed by the states. *See Blue Cross & Blue Shield of Cent. N.Y., Inc. v. McCall,* 89 N.Y.2d 160, 652 N.Y.S.2d 218, 674 N.E.2d 1124, 1126 (1996); *see also German Alliance Ins. Co. v. Lewis,* 233 U.S. 389, 411–14, 34 S.Ct. 612, 618–20, 58 L.Ed. 1011 (1914). Indeed, the states have a long history of regulating the insurance industry. *See, e.g., Linick,* 822 S.W.2d at 299–300. One need only peruse the Texas Insurance Code to understand the pervasiveness of insurance regulation in the United States.

In *Ruckelshaus v. Monsanto Company,* the United States Supreme Court addressed a situation involving another heavily regulated industry, the pesticide industry. The regulations in question involved the statutorily allowed disclosure of confidential information submitted by pesticide companies to the federal Environmental Protection Agency (EPA). *Ruckelshaus,* 467 U.S. at 1000, 104 S.Ct. at 2871. According to the Court, the pesticide industry had "long been the source of public concern and the subject of government regulation." *Id.,* 467 U.S. at 1007, 104 S.Ct. at 2875. The Court reasoned that

"[b]ecause the market for Monsanto's pesticide products is an international one, Monsanto could decide to forgo registration in the United States and sell a pesticide only in [overseas] markets." *Id.,* 467 U.S. at 1007 n. 11, 104 S.Ct. at 2875 n. 11. Further, the Court reasoned "[t]hat Monsanto is willing to bear this burden [of disclosure] in exchange for the ability to market pesticides in this country is evidenced by the fact that it has continued to expand its research and development and to submit data to EPA despite ..." the regulations regarding disclosure. *Id.,* 467 U.S. at 1007, 104 S.Ct. at 2875. After evaluating the reasonableness of Monsanto's expectations, within the context of the pesticide industry, the Court held that no taking had occurred. *Id.,* 467 U.S. at 1005–07, 104 S.Ct. at 2874–75. In short, because Monsanto had subjected itself to the regulations by choosing to be part of the industry, its expectations of avoiding the regulations were not reasonable.

Here, although part of the Occupations Code, section 2303.156(b) is clearly an insurance regulation. *See* Tex. Occ.Code Ann. § 2303.156(b). Its aim is to shift the burden associated with the towing of totaled vehicles from towing companies to insurance companies. This increases the likelihood that towing companies will be willing to tow wrecked vehicles from public roadways. The trial court made a finding of fact that "public safety is affected by the presence of a wrecked vehicle on or near a public highway." Because this finding of fact has not been challenged, we accept it as a proven fact. *See Lovejoy,* 569 S.W.2d at 504. Further, the trial court concluded that this risk to public safety provided a rational basis for the enactment of section 2303.156(b). We agree that this risk to public safety provided a rational basis for the pertinent legislation. *See Exxon Corp.*

*v. Governor of Md.,* 437 U.S. 117, 124–25, 98 S.Ct. 2207, 2213, 57 L.Ed.2d 91 (1978).

According to Canal's representative, Ron King, Canal issued insurance to commercial carriers from "coast to coast," focusing on "over-the-road tractor-trailers . . . long-haul type trucks." "[I]n the course of the week of traveling[, these vehicles] may cross several states." King admitted that "the laws of each state are not exactly the same." Therefore, as a company insuring "thousands" of trucks and trailers across the country, Canal would "have to recognize in one state [that it] may be dealing [with] a different situation in terms of what [it] can or can't do in another state."

According to Canal, "[it] understands that it must comply with Texas law. Canal has never argued that the laws of the state should not be properly applied." Nonetheless, Canal argues that it relied upon "constitutionally guaranteed notions of liberty, protection of personal property, and freedom of contract." Therefore, Canal argues that it had a reasonable expectation of avoiding section 2303.156(b). We disagree.

Canal was operating in an industry that "affects a great many people, is subject to substantial governmental regulation[,] and is stamped with a public interest." *See Eckenrode,* 470 F.2d at 5. By operating as a nationwide insurance company, Canal was enjoying a privilege granted by the states, subject to the conditions imposed by the states. *See McCall,* 652 N.Y.S.2d 218, 674 N.E.2d at 1126; *see also German Alliance Ins.,* 233 U.S. at 411–14, 34 S.Ct. at 618–20. In the specific context of section 2303.156(b), Canal, a foreign corporation, could have chosen to issue insurance policies only to foreign commercial carriers who did not have routes going into or

through Texas, thereby avoiding the statute.[7] Because Canal did not do so, we may conclude that Canal was willing to bear the burdens of Texas law in exchange for the ability to market insurance on a large scale. *See Ruckelshaus,* 467 U.S. at 1007, 104 S.Ct. at 2875. As stated by Canal, "Canal understands that it must comply with Texas law. Canal has never argued that the laws of the state should not be properly applied."

Section 2303.156(b) was a rationally based insurance regulation. In light of the industry in question, its history of regulation, and the strong public interest related to it, combined with the fact that Canal had taken on the burdens of Texas law, we cannot conclude that Canal had a reasonable expectation of avoiding section 2303.156(b). *See id.,* 467 U.S. at 1005–07, 104 S.Ct. at 2874–75. This factor weighs against a finding that a taking occurred. *See id.*

### Governmental Action

We must now consider the character of the governmental action in question. *See Penn Cent. Transp.,* 438 U.S. at 124, 98 S.Ct. at 2659. Canal asserts that

> . . . the . . . application of [section 2303.156(b) ] require[d] the State of Texas . . . to take possession of Canal's property. Such an outcome unquestionably results in the government . . . physically invading and taking Canal's personal property. Therefore, the result imposed by the . . . application of [section 2303.156(b) ] satisfies the [third] factor of the *Penn Central* test.

 Here, our analysis is informed by the purpose of the Takings Clause, which is to bar government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole. *See Pa-*

---

**7.** As used here, the word "foreign" refers to non-Texas entities.

*Iazzolo v. Rhode Island,* 533 U.S. 606, 616–18, 121 S.Ct. 2448, 2457–58, 150 L.Ed.2d 592 (2001). "A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government . . . than . . . [as a] public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Cent. Transp.,* 438 U.S. at 124, 98 S.Ct. at 2659. The United States Supreme Court "has accordingly recognized, in a wide variety of contexts, that government may execute laws or programs that adversely affect recognized economic values." *Id.*

Section 2303.156(b) can be characterized more as a "public program adjusting the benefits and burdens of economic life to promote the common good" than as a "physical invasion by government." *See Penn Cent. Transp.,* 438 U.S. at 124, 98 S.Ct. at 2659. As discussed above, section 2303.156(b) is a rationally based statute governing insurance companies. State insurance company regulations are part of the burdens insurance companies must generally bear for the privilege of doing business in the states. As such, this factor weighs against a taking.

### Weighing of the Factors

Assuming that the impact upon Canal was "substantial," we must still hold that the application of section 2303.156(b) did not constitute a taking. First, as a company that sought out the privilege to conduct a nationwide insurance business, Canal knowingly took on the burdens of the laws of the states. Second, section 2303.156(b) approximates closer to a "public program adjusting the benefits and burdens of economic life to promote the common good" than to a "physical invasion by government." Therefore, we hold that the application of section 2303.156(b) to Canal was not a taking within the meaning of the Takings Clause. *See Penn Cent. Transp.,*

438 U.S. at 124, 98 S.Ct. at 2659. As such, no violation of the Takings Clause occurred.

### State Takings Claim

■ Article I, section 17 of the Texas Constitution provides that "[n]o person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made." TEX. CONST. art I, § 17. Canal qualifies as a "person" for the purposes of our inquiry, *see Mo.-Kan.-Tex.R.R. Co. of Tex. v. Rockwall County Levee Improvement Dist. No. 3,* 117 Tex. 34, 46, 297 S.W. 206, 210 (1927), and the money in question was Canal's property. *See Norris,* 57 Tex. at 643. Therefore, we must determine whether Canal's money was "taken . . . for . . . public use without adequate compensation being made." *See* TEX. CONST. art I, § 17.

Under Texas law, property is generally understood to have been "taken" when it is acquired by the exercise of eminent domain. *See State ex rel. Pan Am. Prod. Co. v. Texas City,* 157 Tex. 450, 453, 303 S.W.2d 780, 782 (1957) ("The constitutional inhibition against taking private property for public use without compensation has reference solely to the exercise of the right of eminent domain . . . ."); *Winship v. City of Corpus Christi,* 373 S.W.2d 844, 848 (Tex.Civ.App.-Corpus Christi 1963, writ ref'd n.r.e.) (reiterating *Pan Am. Prod.).* *But see Rylander v. Palais Royal, Inc.,* 81 S.W.3d 909, 915 (Tex.App.-Austin 2002, pet. denied) ("[State] takings-clause claims are not absolutely limited to eminent domain . . . ."). In this regard, the Texas Supreme Court has distinguished between an unconstitutional taking of property and the mere imposition of taxes.

The right of taxation, and the right of eminent domain, rest substantially upon the same foundation. Private property may be constitutionally [acquired] for public use in two ways, that is to say, by

taxation, and by right of eminent domain. These are rights which the people collectively retain over the property of individuals, to resume such portions of it as may be necessary for public use.... *Taxation operates upon a community, or upon a class of persons in a community, and by [the] same rule of apportionment. The exercise of the right of eminent domain operates upon an individual, and without reference to the amount or value exacted from any other individual or class of individuals* ....

*Norris,* 57 Tex. at 643 (emphasis added).

This difference between an eminent domain taking and taxation has been further elaborated on by the Texas Supreme Court in the context of what constitutes "adequate compensation." According to the court, eminent domain "takes specific property ... upon paying compensation therefor." *City of Austin v. Nalle,* 102 Tex. 536, 538, 120 S.W. 996, 996 (1909). Taxation acquires money, "the only compensation being that it will be appropriated according to law." *Id.; see also Norris,* 57 Tex. at 642–43.

Section 2303.156(b) operates in a manner more akin to a tax than the exercise of eminent domain. The statute operates upon a class of persons or entities (here, insurance companies), and by the same rule of apportionment (all are required to pay the towing fees for vehicles on which they pay a claim of total loss). *See* Tex. Occ.Code Ann. § 2303.156(b). Therefore, the operation of section 2303.156(b) upon Canal did not constitute a taking under Texas constitutional law. *See Norris,* 57 Tex. at 643; *see also Palais Royal,* 81 S.W.3d at 915 ("The State has the authority to levy and collect taxes in a rational and legitimate manner. The exercise of that authority here does not amount to a

taking."). As such, no violation of the Texas Constitution occurred. *See id.*

Even if the operation of section 2303.156(b) upon Canal were a taking, the result would not change. Because the statute operates in a manner more akin to a tax than the exercise of eminent domain, the applicable definition of "adequate compensation" would not require that Canal be reimbursed for the taking. Instead, the only compensation afforded Canal would be the understanding that the money in question "will be appropriated according to law." *See Nalle,* 102 Tex. at 538, 120 S.W. at 996.

### Conclusion

Having held that no taking occurred, we overrule Canal's eighth and ninth issues.

### DUE PROCESS

In its tenth issue, Canal challenges the constitutionality of section 2303.156(b), arguing that the statute, as applied, resulted in a violation of Canal's procedural due process rights under the United States Constitution.

Procedural due process ensures that government decisions will be made with sufficient procedural safeguards. *See Mathews v. Eldridge,* 424 U.S. 319, 332, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976). A fundamental requirement of due process in any proceeding that is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. *Armstrong v. Manzo,* 380 U.S. 545, 550, 85 S.Ct. 1187, 1190, 14 L.Ed.2d 62 (1965). Another fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. *Id.,* 380 U.S. at 552, 85 S.Ct. at 1191.

The determination of whether a statute acts in violation of constitutional due process requirements is a question of law reviewed de novo. *See Operating Contractors,* 985 S.W.2d at 650–51.

Canal asserts that

[i]n the present case, it is clear that Canal's private interest has been infringed upon with no procedural notice or opportunity to be heard. Canal never owned the vehicles towed, never received any notice that they were going to be towed until after it had already happened, and only much later learned what had happened.... Canal [had] no meaningful opportunity to explain its position-it never owned nor was it responsible for the vehicles. Canal merely insured the two vehicles.

In short, Canal argues that it was entitled to immediate notice of the wreck and the possibility that the vehicles would be towed, along with the immediate opportunity to urge that it was not responsible for the payment of towing charges.

The deprivation in question occurred when the trial court entered a money judgment against Canal. Until that time, Canal had not been ordered to pay any money. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985) (construing the deprivation of an employee's property interest in employment as occurring at the employee's actual termination). By the time the judgment was entered, Canal had been served with Hopkins's petition and, thus, put on notice of Hopkins's lawsuit against it. This notice met the requirements of due process. *See Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950) ("Personal service of written notice within the jurisdiction is the classic form of notice always adequate in any type of proceeding."). Finally, Canal had a

meaningful opportunity to be heard: a full trial was held in which Canal was given an opportunity to make legal arguments as well as put on relevant evidence and cross examine the witnesses against it. Nothing more was required. *See Manzo,* 380 U.S. at 552, 85 S.Ct. at 1191. We overrule Canal's tenth issue.

### DISPOSITION

We *affirm* the judgment of the trial court.