

NUMBER 13-09-00216-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

## IN THE INTEREST OF I.E.W., A CHILD

**On appeal from the County Court at Law
No. 1 of Calhoun County, Texas.**

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Garza and Benavides
Memorandum Opinion by Justice Garza**

Appellant, J.G., challenges the trial court's denial of his motion to vacate a temporary protective order prohibiting him from having any contact with his daughter, I.E.W., a child. J.G. argues by three issues that the trial court erred in denying his motion to vacate. We affirm in part and reverse and render in part.

### I. BACKGROUND

I.E.W. was born on February 5, 2003. On December 8, 2004, I.E.W.'s mother, S.W., filed a petition to establish J.G.'s parentage of I.E.W. The petition was accompanied by a statement of paternity sworn to by J.G. in which he acknowledged that he is the biological father of I.E.W. J.G. and S.W. later consented to a final decree, dated January 25, 2005, establishing J.G.'s parentage, awarding S.W. the exclusive right to establish I.E.W.'s residence, and providing that J.G. would have visitation with I.E.W. "as mutually

agreed by the parties."[1]  Since that time, I.E.W. has resided with her mother and maternal grandmother, D.W., at D.W.'s house in Seadrift, Texas.  For two years, the parties were able to arrange, by mutual agreement, periodic visits for I.E.W. with her father.

On May 30, 2007, J.G. filed a petition with the trial court to modify the 2005 agreed order to provide that J.G. would have standard visitation with I.E.W.  J.G. later filed an amended petition containing an additional request that he be appointed joint managing conservator of the child.  After a hearing, the trial court awarded J.G. joint managing conservatorship and ordered standard visitation to be phased in.  *See* TEX. FAM. CODE ANN. § 153.312 (Vernon Supp. 2009).  Specifically, J.G. was awarded two initial weekends of overnight visitation with I.E.W. in October 2007, with standard visitation to start at Thanksgiving of that year.

According to J.G., he and S.W. enjoyed a "good" relationship prior to his seeking standard visitation, but the relationship "deteriorated" afterward.  J.G. alleges that, almost immediately after he first requested standard visitation, S.W. and D.W. "made a series of unsuccessful initial attempts at getting [criminal] charges filed against [J.G.] and his fiancée [K.G.], and limiting his visitation."  For example, J.G. noted that S.W. attempted to have stalking charges filed against him based solely on his "driving from a different direction than usual to pick up [I.E.W.]."  Testimony later established that S.W. visited the chief of the Seadrift Police Department, Roger Tumlinson, at his home, in an effort to press these charges.  Chief Tumlinson advised S.W. that the events she described occurred outside the city limits of Seadrift and therefore out of his jurisdiction; he also told S.W. that the events she described do not in any case constitute a crime.

Under the terms of the trial court's order, J.G.'s overnight visits with I.E.W. took place as scheduled on the weekends of October 6 and October 20, 2007.  According to J.G., the visits went well, and I.E.W. "had a great time."  J.G. dropped I.E.W. off with her

---

[1] The agreed order changed I.E.W.'s name by appending J.G.'s surname thereto.  For convenience, we will refer to the child as I.E.W., which are the initials of her name as used in the trial court proceedings, rather than I.E.W.-G., which are the initials of her legal name according to the January 25, 2005 order.

mother and grandmother on the afternoon of October 21, 2007; he has not seen his daughter since that day.

Shortly after I.E.W.'s first scheduled overnight visit, S.W. reported that I.E.W. told her that she had sleepwalked while staying overnight at her father's house. According to S.W., I.E.W. said that: (1) she sleepwalked all the way outside of J.G.'s house, at which point K.G. "drug" her back into the house; (2) she was then put back to sleep into the same bed as J.G. and K.G.; and (3) J.G. was sleeping in the nude. According to police records entered into evidence, S.W. contacted the Calhoun County Sheriff's Office to report these events and to request a restraining order "because she [S.W.] did not want [K.G.] around her daughter." S.W. was informed by a Sheriff's Office investigator, Rennett Todd, that the events she described do not constitute a crime, and "there was nothing that could be done on how [J.G.] chose to raise [I.E.W.] on his weekends." Investigator Todd noted in her report that she told S.W. "that law enforcement could not get involved unless there was an outcry made by [I.E.W.]."

On the evening of October 21, 2007, after J.G. had returned I.E.W. to S.W., S.W. contacted Officer Tim Smith, an assistant chief with the Seadrift Police Department, and asked to file a report of abuse. According to the offense report entered into evidence, S.W. told Officer Smith that I.E.W. "had been sexually abused while with [J.G.] the previous evening." According to Officer Smith's report, S.W. stated that I.E.W. complained of soreness in her genital area after returning home. S.W. also stated that I.E.W. told D.W. that "Daddy touched me there," with "there" referring to her genital area. Officer Smith did not attempt to interview the alleged perpetrator, J.G., or the alleged outcry witness, D.W. Instead, Officer Smith advised S.W. that he would arrange for a forensic interview and SANE (Sexual Assault Nurse Examiner) examination as soon as possible. To this end, he called his wife, Beverly Smith, an employee at the Harbor Children's Alliance and Victim Center ("Harbor") in Port Lavaca, Texas. Beverly Smith conducted an interview with the child the following morning. Officer Smith accompanied S.W., D.W., and I.E.W to Harbor for the interview and, later that day, to Citizens Medical Center in Victoria, Texas, for the

3

SANE examination.

At the Harbor interview, Beverly Smith talked with I.E.W. about private parts of the body and then asked I.E.W. whether anyone had touched her private parts. I.E.W. first said no, but then changed her answer and said that her father touched her private parts with his finger. Beverly Smith then asked I.E.W. what her father said to her when he touched her privates with his finger; I.E.W. responded that he said, "I will touch your privates." According to Beverly Smith, that response "seem[ed] strange," but "it's not my place to say that she is telling the truth or that she is not." I.E.W. further explained that the touching occurred "[a]t my daddy's house . . . [i]n my room" and that K.G. was present at the time.

The SANE examination was conducted by Sexual Assault Nurse Examiner Leslie Kallus. Kallus testified that I.E.W. informed her that "[m]y daddy touched me here [pointing to her genital area] with his finger. It tickled. We were in my bedroom. It was light outside." Kallus then asked I.E.W. more questions about the touching, but I.E.W. would not answer. The physical examination revealed "some . . . sand-like debris bilaterally in the labia majora, . . . some clear secretions surrounding the clitoris, and . . . a reddened area from [two] o'clock to [eleven] o'clock on the hymen." Kallus testified that these findings were "nonspecific," and "could be consistent with sexual assault or sexual abuse, but [are] also seen in nonabused children." Kallus noted, as Beverly Smith did, that she is trained to accept what children tell her as the truth, and that "it is beyond [her] scope" to determine whether or not a child is being coached or coerced to make false allegations.

J.G. denied ever having touched I.E.W. in an inappropriate way, or even in a way that could be thought of by someone else as inappropriate. Nevertheless, as a result of the outcry made by I.E.W., prosecuting attorneys sought charges against J.G. for indecency with a child, a second-degree felony. *See* TEX. PENAL CODE ANN. § 21.11(a)(1), (d) (Vernon Supp. 2009). Also as a result of the outcry, S.W. applied for a family violence protective order forbidding J.G. from having contact with I.E.W. *See* TEX. FAM. CODE ANN. § 85.022 (Vernon Supp. 2009). On December 10, 2007, J.G. was served with S.W.'s

4

protective order application as well as a temporary ex parte protective order prohibiting J.G. from having contact with I.E.W. and setting a hearing for December 12, 2007.

According to J.G., his criminal defense attorney advised that he consent to the entry of the protective order "on a temporary basis to avoid a default or the necessity to stand on his fifth amendment rights . . . in view of allegations of a felony." Therefore, on December 12, 2007, without holding an evidentiary hearing, the trial court rendered a "Temporary Protective Order" which had been consented to and signed by J.G., S.W., and their attorneys. The order prohibited J.G. from: (1) committing family violence, as defined in section 71.004 of the family code, *see id.* § 71.004 (Vernon 2008); (2) communicating directly with I.E.W. in a threatening or harassing manner; (3) communicating in any manner with I.E.W. except through S.W.'s attorney; (4) engaging in any conduct specifically directed toward I.E.W. that is reasonably likely to "harass, annoy, alarm, abuse, torment, or embarrass" I.E.W.; (5) going to or near S.W.'s residence or place of employment; and (6) going to or near I.E.W.'s residence or any child-care facility or school she normally attends. *See id.* § 85.022.

In 2008, a Calhoun County grand jury "no-billed," or declined to indict, J.G. on the indecency with a child charge. J.G. then filed a motion with the trial court on September 4, 2008, seeking to vacate the temporary protective order. *See id.* § 85.025 (Vernon 2008). In his motion, J.G. argued that: (1) S.W.'s protective order application was insufficient because it did not contain a "detailed description of the facts and circumstances concerning the alleged family violence," *see id.* § 82.009(1) (Vernon 2008); (2) the order itself contained no finding of family violence as required by statute, *see id.* § 85.001 (Vernon 2008); and (3) there was no continuing need for the order, in part because J.G. had been no-billed by the grand jury.[2]

_____

[2] J.G. noted in his motion to vacate that:

on the advice of legal counsel [he] did not . . . testify at the protective order hearing by virtue of the then pending Grand Jury presentation and therefore signed an 'AGREED' and 'TEMPORARY' protective order to avoid testifying or the possibility of a default finding of family violence. [J.G.] alleges his actions in signing the Temporary Order was [sic] the only reasonable manner of due process available to defend himself from the false accusations

5

On November 24, 2008, after a full evidentiary hearing, the trial court rendered its order denying J.G.'s motion to vacate. Subsequently, on J.G.'s request, the trial court entered findings of fact and conclusions of law. The findings of fact included the following:

5. The Court finds that, prior to December 12, 2007, [J.G.] committed family violence against [I.E.W.].

6. The Court finds that, prior to December 12, 2007, [J.G.] engaged in sexual conduct toward [I.E.W.] which was harmful to [I.E.W.]'s mental, emotional or physical welfare.

7. The Court finds that it is not in the best interest of [I.E.W.] that the Temporary Protective Order rendered and signed December 12, 2007 be vacated.

8. The Court finds that it is not in the best interest of [I.E.W.] to modify the terms and conditions of the Temporary Protective Order rendered and signed December 12, 2007.

9. The Court finds that it is not in the best interest of [I.E.W.] that [J.G.] be granted possession of [I.E.W.].

10. The Court finds that it is not in the best interest of [I.E.W.] that [J.G.] be granted access to [I.E.W.].

11. The Court finds that there is a continuing need for the "Temporary Protective Order" rendered and signed December 12, 2007.

12. The Court finds that it is in the best interest of [I.E.W.] that the Temporary Protective Order remain in full force and effect.[3]

The conclusions of law stated as follows:

and that he has suffered damages as a result thereof.

(Emphases in original.)

[3] The trial court also made certain "negative" findings of fact, stating that:

The evidence admitted at trial failed to establish, by a preponderance of the credible evidence, the following facts:

1. That it is in the best interest of [I.E.W.] that the "Temporary Protective Order" rendered and signed December 12, 2007 be modified.

2. That it is in the best interest of [I.E.W.] that the "Temporary Protective Order" rendered and signed December 12, 2007 be vacated.

3. That there is not a continuing need for the "Temporary Protective Order" rendered and signed December 12, 2007.

4. That it is in the best interest of [I.E.W.] that [J.G.] be granted access to [I.E.W.].

5. That it is in the best interest of [I.E.W.] that [J.G.] be granted access possession of [I.E.W.].

1.	The Temporary Protective Order rendered and signed December 12, 2007 is an order rendered and signed by mutual agreement and consent of [J.G.] and [S.W.] pursuant to § 85.005 of the Texas Family Code.

2.	By virtue of his agreement and consent to the terms of the "Temporary Protective Order" rendered and signed December 12, 2007, [J.G.] has judicially admitted that rendition of said order was in the best interest of [I.E.W.].

3.	By virtue of his agreement and consent to the terms of the "Temporary Protective Order" rendered and signed December 12, 2007, [J.G.] has judicially admitted that rendition of said order was necessary for the prevention of family violence.

4.	By virtue of his agreement and consent to the terms of the "Temporary Protective Order" rendered and signed December 12, 2007, [J.G.] is estopped from challenging the validity of the "Temporary Protective Order" rendered and signed December 12, 2007.

5.	The "Temporary Protective Order" rendered and signed December 12, 2007 should not be modified.

6.	The "Temporary Protective Order" rendered and signed December 12, 2007 should not be vacated.

This appeal followed.

## II. DISCUSSION

On appeal, J.G. argues that the trial court erred in denying his motion to vacate the protective order for the following reasons: (1) there was no evidence adduced as to events occurring since the original rendition of the order that would justify continuation of the order; (2) the original protective order "is overly-broad, excessive, a violation of [J.G.'s] constitutional rights as a parent, and is not in the best interest of the child"; and (3) the evidence adduced at the hearing on J.G.'s motion to vacate was legally and factually insufficient to support the trial court's findings of fact and conclusions of law.

### A.	Mootness

The protective order at issue expired two years after it was originally issued, on December 12, 2009, which was after submission of the instant appeal to this Court. *See* TEX. FAM. CODE ANN. § 85.025(a) (stating that a protective order is effective until the second anniversary of the date the order was issued, unless an earlier expiration date is

stated in the order). Therefore, even though the issue of mootness was not addressed or briefed by either party, we must address whether or not J.G.'s appellate issues are moot. *See Clements v. Haskovec*, 251 S.W.3d 79, 83 (Tex. App.–Corpus Christi 2008, no pet.) (citing *Labrado v. County of El Paso*, 132 S.W.3d 581, 589 (Tex. App.–El Paso 2004, no pet.) (describing mootness as "a component of subject matter jurisdiction")); *Schaban-Maurer v. Maurer-Schaban*, 238 S.W.3d 815, 822-23 (Tex. App.–Fort Worth 2007, no pet.). The general rule is that a case becomes moot, and thus unreviewable, when it appears that a party seeks to obtain relief on some alleged controversy when in reality none exists. *Williams v. Lara*, 52 S.W.3d 171, 184 (Tex. 2001); *Clements*, 251 S.W.3d at 83; *Schaban-Maurer*, 238 S.W.3d at 822. An expired temporary protective order is generally considered moot for this reason. *See James v. Hubbard*, 21 S.W.3d 558, 560 (Tex. App.–San Antonio 2000, no pet.).

However, Texas law recognizes a "collateral consequences" exception to the mootness doctrine. *See, e.g., Gen. Land Office of State of Tex. v. OXY U.S.A., Inc.*, 789 S.W.2d 569, 571 (Tex. 1990). This exception is applied when prejudicial events have occurred that will continue to stigmatize the subject of the protective order long after the order has ceased to operate. *See Clements*, 251 S.W.3d at 84; *In re Cummings*, 13 S.W.3d 472, 475 (Tex. App.–Corpus Christi 2000, no pet.). The exception applies to a protective order containing a finding of family violence, because such a finding carries a social stigma, as well as legal consequences, even after the order has expired. *Schaban-Maurer*, 238 S.W.3d at 822-23; *James*, 21 S.W.3d at 560; *In re Cummings*, 13 S.W.3d at 475*; see* TEX. FAM. CODE ANN. § 153.004(f) (Vernon Supp. 2009) (mandating that a trial court must consider the issuance of a protective order in determining child custody issues); *Clements*, 251 S.W.3d at 84. We therefore conclude that J.G.'s appellate issues are reviewable under the "collateral consequences" exception to the mootness doctrine.

**B.    Applicable Law and Standard of Review**

A protective order under section 85.022 of the family code may not be issued unless

8

the trial court finds that family violence (1) has occurred and (2) is likely to occur in the future. TEX. FAM. CODE ANN. § 81.001 (Vernon 2008); § 85.001(a), (c). A person who is the subject of a protective order "may file a motion . . . requesting that the court review the protective order and determine whether there is a continuing need for the order."[4] *Id.* § 85.025(b). After a hearing, if the trial court finds there is a "continuing need" for the protective order, the order will remain in effect until the statutory two-year period expires; however, if the trial court finds there is no "continuing need," the court "shall order that the protective order expires on a date set by the court." *Id.*

The best interest of the child is the primary consideration in determining conservatorship and possession of and access to the child. *Id.* § 153.002 (Vernon 2008). A trial court has wide discretion in determining the best interest of a child in family law matters such as custody, visitation, and possession. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). We will reverse the trial court's judgment only when it appears from the record as a whole that the trial court abused its discretion. *Id.*; *see Stamper v. Knox*, 254 S.W.3d 537, 542 (Tex. App.–Houston [1st Dist.] 2008, no pet.) ("A trial court's decision modifying the parent-child relationship is reviewed for abuse of discretion, and will only be disturbed when it is clear the court acted in an arbitrary or unreasonable manner, without reference to any guiding rules or principles.").

## C.    Analysis

The December 12, 2007 order does not contain any finding that family violence occurred or that family violence is likely to occur in the future. *See* TEX. FAM. CODE ANN. § 85.001(a), (c). Instead, it states merely that the restrictions contained in the order "are for the safety and welfare and in the best interest of members of the family and are necessary for the prevention of family violence." After the November 24, 2008 hearing on

---

[4] Section 85.025(b) of the family code provides that a motion to vacate a protective order may be filed "not earlier than the first anniversary of the date on which the order was rendered . . . ." TEX. FAM. CODE ANN. § 85.025(b) (Vernon 2008). Although the hearing and order on J.G.'s motion to vacate took place more than one year after the protective order was rendered, the motion itself was filed on September 4, 2008, which was less than one year after the original rendition of the order on December 12, 2007. Nevertheless, neither party raised the issue of the timeliness of J.G.'s motion either with the trial court or with this Court, and we do not address that issue here. *See* TEX. R. APP. P. 33.1(a); 47.1.

J.G.'s motion to vacate, the trial court did specifically find that J.G. had committed family violence, but it made no finding as to a likelihood of future violence. *See id.* J.G. argues that the failure of the trial court to make the requisite findings means, as a matter of law, that it was error for the trial court to deny his motion to vacate.

On the other hand, the trial court concluded, and S.W. contends on appeal, that "[b]y consenting to the rendition of a protective order pursuant to the provisions of [section] 85.022, [J.G.] has judicially admitted all underlying facts necessary to the rendition of the protective order." The trial court also concluded that J.G., having agreed to the original protective order, is now "estopped from challenging the validity" of that order. We disagree. By agreeing to the temporary protective order, it is apparent that J.G. voluntarily consented to severe restrictions on his parental rights. Given the fact that the protective order stated no expiration date, it can also be said that J.G. consented to the imposition of these restrictions for as long as two years. *See id.* § 85.025(a). However, we are unwilling to say that J.G. voluntarily consented to findings that he committed family violence, and was likely to commit family violence in the future, merely because he consented to the protective order. According to J.G., his consent to the rendition of the December 12, 2007 protective order was on the advice of his criminal defense attorney, and was done solely to avoid having to testify or plead his fifth amendment rights at a protective order hearing. Regardless of whether this rationale was legally or strategically sound, the fact remains that the December 12, 2007 order contained no explicit findings as to family violence or the likelihood of future violence. We cannot presume that J.G. would have consented to such an order had those findings been explicitly included.

We note also that the doctrine of judicial estoppel, which underlies the concept of judicial admission, is inapplicable here. For a judicial admission to exist and be conclusive against a party, the following elements must be shown: (1) the statement relied on was made during the course of a judicial proceeding; (2) the statement is contrary to an essential fact embraced in the theory of recovery or defense asserted by the person who made the statement; (3) the statement was deliberate, clear, and unequivocal; (4) giving

conclusive effect to the statement would be consistent with public policy; and (5) the statement relates to a fact upon which a judgment for the opposing party may be based. *Balaban v. Balaban*, 712 S.W.2d 775, 777-78 (Tex. App.–Houston [1st Dist.] 1986, writ ref'd n.r.e.). Here, even if one could infer the existence of family violence by J.G.'s consent to the original protective order, the order certainly did not contain any "deliberate, clear, [or] unequivocal" admission that family violence occurred or was likely to occur in the future. *See id.*; *see also* TEX. FAM. CODE. ANN. § 85.005(e) (Vernon 2008) ("An agreed protective order is not enforceable as a contract."). Further, the doctrine of judicial admissions does not apply to contradictory positions taken in the same proceeding. *Estate of Devitt*, 758 S.W.2d 601, 604-05 (Tex. App.–Amarillo 1988, pet. denied). For these reasons, we disagree with the trial court's conclusion that J.G. is estopped from challenging the validity of the order by virtue of his prior consent.

We therefore address J.G.'s substantive challenges to the original protective order, to the trial court's denial of his motion to vacate, and to the findings of fact and conclusions of law entered by the trial court.

### 1.    Evidence of Events Occurring Since Original Rendition of Order

By his first issue, J.G. contends that the trial court erred in denying his motion to vacate the December 12, 2007 protective order because there was no evidence adduced as to events occurring since the original rendition of the order that would justify the continuation of the order.

Section 85.025(a)(1) of the Texas Family Code provides that, if a protective order does not state an expiration date, the order shall expire two years after it is first issued. TEX. FAM. CODE ANN. § 85.025(a)(2). As noted, section 85.025(b) provides that a person who is the subject of a protective order "may file a motion requesting that the court review the protective order and determine whether there is a continuing need for the order." *Id.* § 85.025(b).

No evidence was adduced at the November 24, 2008 hearing indicating that, since the protective order was issued, J.G. had committed any violations of the protective order

11

or had engaged in any other inappropriate behavior. J.G. argues that this compelled the trial court to vacate the protective order. However, the fact that no family violence has occurred since entry of the order does not necessarily mean that there is no continuing need for the order. On the contrary, the trial court could have determined that: (1) the protective order was itself the main factor ensuring that J.G. refrained from engaging in objectionable behavior; and (2) without the protective order remaining in force, I.E.W. would be left exposed to the potential danger that the order sought to eliminate.

J.G. further claims that (1) "the Order was supposed to be temporary . . . and was intended to last only so long as the criminal charges were pending," and (2) "[b]ecause it was temporary, it was necessarily intended to last less than the statutory 2 years." However, J.G. does not provide this Court with any authority supporting these contentions. On the contrary, upon asking that the order be vacated, the burden was on J.G. to establish that there was no "continuing need" for the order. *See id.* § 85.025(b). There is no presumption that a protective order must expire prior to the statutory two-year limit, and the order's characterization as "temporary" does not alter that fact.

We overrule J.G.'s first issue.

## 2.     Challenges to Content of Protective Order

By his second issue, J.G. argues that the original protective order, which prohibited any contact between him and I.E.W., "is overly-broad, excessive, a violation of [J.G.'s] constitutional rights as a parent, and is not in the best interest of the child."

"The terms of an order that denies possession of a child to a parent or imposes restrictions or limitations on a parent's right to possession of or access to a child may not exceed those that are required to protect the best interest of the child." *Id.* § 153.193 (Vernon 2008). Even assuming that J.G. committed the act of family violence of which he is accused, we find that the restrictions placed on J.G.'s access by the December 12, 2007 protective order far exceeded what was required to protect I.E.W.'s best interest. The trial court was empowered, even if it found "a history or pattern" of family violence, to order supervised visitation, among other things, in order to ensure that the child's best interests

12

are protected while also providing some access for the parent. *See id.* § 153.004(d); *In re J.R.D.*, 169 S.W.3d 740, 749 (Tex. App.–Austin 2005, pet. denied) ("The legislature has declared a presumption that it is in the child's best interest to have the minimum amount of time with any reasonably safe parent . . . ."). Instead, the trial court approved an agreed protective order that prohibited any contact between J.G. and I.E.W., despite the fact that only one instance of family violence had been alleged, and no facts had been alleged that would support a finding of a likelihood of future violence. Even if J.G., upon advice of counsel, deemed the protective order's restrictions to be in his best interest, it was the trial court's responsibility to reject that agreed protective order if it was not in the best interest of the child. *See* TEX. FAM. CODE ANN. § 85.005(b) (noting that agreed protective orders are subject to the trial court's approval); *id.* § 85.005(c) ("If the court approves an agreement between the parties, the court shall render an agreed protective order that is in the best interest of the applicant, the family or household, or a member of the family or household."); *id.* § 153.002 ("The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child.").

We note further that it is unclear whether the trial court even had the authority to approve a protective order, such as the one agreed to by J.G. and S.W., that imposed such severe restrictions on one parent's access to the child. Parties are permitted to consent to protective orders, but such agreed orders are subject to the approval of the trial court, and trial courts are strictly prohibited from approving any agreement that requires an "applicant to do or refrain from doing an act under Section 85.022." *Id.* § 85.005(b). The December 12, 2007 order precisely tracks the language of section 85.022 in requiring that J.G. refrain entirely from, among other things, communicating with I.E.W. or going to or near her residence. *See id.* § 85.022. If J.G. is considered an "applicant" under the statute, then the trial court lacked the authority to approve of the agreed protective order because it restricted J.G. as provided under section 85.022. *See id.* § 85.005(b).

We conclude that the December 12, 2007 protective order violated the statute

13

governing such orders by (1) failing to include specific findings as to the likelihood of future family violence, and (2) including restrictions on J.G.'s access to I.E.W. that exceeded what was required to protect I.E.W.'s best interest. *See id.* §§ 85.001(c), 153.193. These deficiencies were brought to the trial court's attention in J.G.'s motion to vacate and at the subsequent hearing. *See id.* § 87.001 (Vernon 2008) ("On the motion of any party, the court, after notice and hearing, may modify an existing protective order to: (1) exclude any item included in the order; or (2) include any item that could have been included in the order."); *James*, 985 S.W.2d at 518 (stating that a protective order is a permanent injunction that "'may be reviewed, opened, vacated or modified by the trial court upon a showing of changed conditions'") (quoting *Smith v. O'Neill*, 813 S.W.2d 501, 502 (Tex. 1991)). The trial court had no discretion, therefore, to deny that motion, and it was reversible error for it to have done so. *See Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) ("A trial court has no 'discretion' in determining what the law is or applying the law to the facts."). Accordingly, we sustain J.G.'s second issue.

### 3. Findings of Fact and Conclusions of Law

J.G. contends by his third issue that the evidence was legally and factually insufficient to support the trial court's findings of fact and conclusions of law issued after the November 24, 2008 hearing on J.G.'s motion to vacate. We have already concluded that the terms of the original protective order were contrary to I.E.W.'s best interests and violated the statute governing such orders; accordingly, we reverse the findings of fact and conclusions of law that are to the contrary.[5] We now consider the remaining findings issued by the trial court; specifically, we address findings of fact numbers five and six, stating that J.G. committed family violence against and engaged in sexual conduct with I.E.W., respectively.

When the trial court acts as a fact-finder, as here, we review its findings under

---

[5] Specifically, we reverse the trial court's findings of fact numbers seven through twelve; conclusions of law numbers two through six; and all five "negative" findings of fact.

14

traditional legal and factual sufficiency standards.[6]  *In re Doe*, 19 S.W.3d 249, 253 (Tex. 2000); *Clements*, 251 S.W.3d at 84.  In considering legal sufficiency, we consider all the evidence in the light most favorable to the trial court's finding, indulging every inference in its favor.  *In re L.M.I.*, 119 S.W.3d 707, 718 (Tex. 2003).  We will sustain a legal sufficiency complaint only if the record reveals:  (1) the complete absence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact.  *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005).  When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is less than a scintilla and, in legal effect, is no evidence.  *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).  The ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to make the finding under review.  *See City of Keller*, 168 S.W.3d at 827.

In reviewing factual sufficiency, we consider all of the evidence and will uphold the finding unless the supporting evidence is so weak or the finding so against the overwhelming weight of the evidence as to render the finding manifestly unjust.  *Golden Eagle Archery v. Jackson*, 116 S.W.3d 757, 761-62 (Tex. 2003).  We review conclusions of law de novo.  *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

Under both legal and factual sufficiency standards, the fact-finder is the sole judge of the witnesses' credibility and the weight to be given their testimony.  *See City of Keller*, 168 S.W.3d at 819 (stating that, under legal-sufficiency standard, fact-finder is "the sole judge . . . of the credibility of the witnesses and the weight to be given their testimony"); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) ("[I]n conducting a factual

---

[6] We note that Texas appellate courts are divided over the proper standard to employ in reviewing the evidence supporting protective orders.  *Compare In re Epperson*, 213 S.W.3d 541, 543 (Tex. App.–Texarkana 2007, no pet.) *and Thompson v. Thompson-O'Rear*, No. 06-03-00129-CV, 2004 Tex. App. LEXIS 5033, at *4 (Tex. App.–Texarkana June 8, 2004, no pet.) (mem. op.) (applying abuse of discretion standard) *with Clements v. Haskovec*, 251 S.W.3d 79, 84 (Tex. App.–Corpus Christi 2008, no pet.) *and Vongontard v. Tippit*, 137 S.W.3d 109, 112 (Tex. App.–Houston [1st Dist.] 2004, no pet.) (applying legal and factual sufficiency standard).

sufficiency review, a court must not merely substitute its judgment for that of the jury . . . ."); *Canal Ins. Co. v. Hopkins*, 238 S.W.3d 549, 557 (Tex. App.–Tyler 2007, pet. denied) (op. on reh'g).

Here, the evidence showed that I.E.W. made an outcry of one instance of sexual abuse to three people: (1) D.W., I.E.W.'s grandmother; (2) Beverly Smith, who interviewed I.E.W. at Harbor; and (3) Kallus, the nurse that conducted the SANE examination on I.E.W. According to Kallus, her examination of I.E.W's genital area revealed abnormalities that may or may not have been the result of sexual abuse. J.G. argues that "[t]he evidence of any sexual assault boils down to two bare hearsay statements by [I.E.W.] that were made in response to direct and suggestive questioning in the context of determining why her genital area was red and swollen." While this may be true, J.G. does not challenge the admissibility of Smith's or Kallus's testimony as to I.E.W.'s outcry, nor does he suggest that "the court is barred by rules of law or of evidence from giving weight" to that evidence. *See City of Keller*, 168 S.W.3d at 810. The fact that I.E.W. made a substantially similar outcry statement to three different people gives rise to more than a mere suspicion that the events she described actually occurred; that is, the evidence supporting the trial court's findings amounts to more than a mere scintilla. *See Ford Motor Co.*, 135 S.W.3d at 601. Our review of the evidence also shows that J.G. did not establish conclusively that the outcry statements made by I.E.W. were false, coached, or coerced. *See City of Keller*, 168 S.W.3d at 827.

Viewing the evidence in the light most favorable to the trial court's findings, we cannot say that reasonable and fair-minded people could not have reached those same conclusions. *See id.* Moreover, considering all the evidence, we cannot conclude that the trial court's findings are so contrary to the great weight and preponderance of the evidence as to be manifestly unjust. *See Golden Eagle Archery*, 116 S.W.3d at 761-62. We therefore conclude that the evidence adduced at the November 24, 2008 hearing was

16

legally and factually sufficient to support findings of fact numbers five and six.[7] J.G.'s third issue is overruled.

## III. CONCLUSION

We reverse the judgment of the trial court denying J.G.'s motion to vacate and render judgment vacating the December 12, 2007 temporary protective order in its entirety. Further, we affirm in part and reverse in part the trial court's findings of fact and conclusions of law as stated in this opinion.

DORI CONTRERAS GARZA,
Justice

Delivered and filed the
21st day of January, 2010.

---

[7] We note that evidence that a person has engaged in abusive conduct in the past may allow, but does not require, an inference that the person will continue violent behavior in the future. *Schaban-Maurer v. Maurer-Schaban*, 238 S.W.3d 815, 824 (Tex. App.–Fort Worth 2007, no pet.); *see Clements*, 251 S.W.3d at 87-88; *In re Epperson*, 213 S.W.3d at 543-44 ("Oftentimes, past is prologue; therefore, past violent conduct can be competent evidence which is legally and factually sufficient to sustain the award of a protective order."); *see also Gonzalez v. Galvan*, No. 13-08-488-CV, 2009 Tex. App. LEXIS 2788, at *5-6 (Tex. App.–Corpus Christi Apr. 23, 2009, no pet.) (mem. op.). However, the trial court made no finding, at any point in the underlying proceedings, that there was a likelihood of future family violence in this case. Therefore, we do not address the question of whether the evidence adduced at the November 24, 2008 hearing supported such a finding.