NUMBER 13-09-00216-CV



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


IN THE INTEREST OF I.E.W., A CHILD

 




On appeal from the County Court at Law


No. 1 of Calhoun County, Texas.

 


MEMORANDUM OPINION



Before Chief Justice Valdez and Justices Garza and Benavides


Memorandum Opinion by Justice Garza



 We withdraw our memorandum opinion and judgment dated January 21, 2010 and
substitute the following in its place.

 Appellant, J.G., challenges the trial court's denial of his motion to vacate a
temporary protective order prohibiting him from having any contact with his daughter,
I.E.W., a child. J.G. argues by three issues that the trial court erred in denying his motion
to vacate. We reverse the trial court's judgment and render judgment granting J.G.'s
motion.

I. Background

 I.E.W. was born on February 5, 2003. On December 8, 2004, I.E.W.'s mother,
S.W., filed a petition to establish J.G.'s parentage of I.E.W. The petition was accompanied
by a statement of paternity sworn to by J.G. in which he acknowledged that he is the
biological father of I.E.W. J.G. and S.W. later consented to a final decree, dated January
25, 2005, establishing J.G.'s parentage, awarding S.W. the exclusive right to establish
I.E.W.'s residence, and providing that J.G. would have visitation with I.E.W. "as mutually
agreed by the parties." (1) Since that time, I.E.W. has resided with her mother and maternal
grandmother, D.W., at D.W.'s house in Seadrift, Texas. For two years, the parties were
able to arrange, by mutual agreement, periodic visits for I.E.W. with her father.

 On May 30, 2007, J.G. filed a petition with the trial court to modify the 2005 agreed
order to provide that J.G. would have standard visitation with I.E.W. J.G. later filed an
amended petition containing an additional request that he be appointed joint managing
conservator of the child. After a hearing, the trial court awarded J.G. joint managing
conservatorship and ordered standard visitation to be phased in. See Tex. Fam. Code Ann.
§ 153.312 (Vernon Supp. 2009). Specifically, J.G. was awarded two initial weekends of
overnight visitation with I.E.W. in October 2007, with standard visitation to start at
Thanksgiving of that year.

 According to J.G., he and S.W. enjoyed a "good" relationship prior to his seeking
standard visitation, but the relationship "deteriorated" afterward. J.G. alleges that, almost
immediately after he first requested standard visitation, S.W. and D.W. "made a series of
unsuccessful initial attempts at getting [criminal] charges filed against [J.G.] and his fiancée
[K.G.], and limiting his visitation." For example, J.G. noted that S.W. attempted to have
stalking charges filed against him based solely on his "driving from a different direction than
usual to pick up [I.E.W.]." Testimony later established that S.W. visited the chief of the
Seadrift Police Department, Roger Tumlinson, at his home, in an effort to press these
charges. Chief Tumlinson advised S.W. that the events she described occurred outside
the city limits of Seadrift and therefore out of his jurisdiction; he also told S.W. that the
events she described do not in any case constitute a crime.

 Under the terms of the trial court's order, J.G.'s overnight visits with I.E.W. took
place as scheduled on the weekends of October 6 and October 20, 2007. According to
J.G., the visits went well, and I.E.W. "had a great time." J.G. dropped I.E.W. off with her
mother and grandmother on the afternoon of October 21, 2007; he has not seen his
daughter since that day.

 Shortly after I.E.W.'s first scheduled overnight visit, S.W. reported that I.E.W. told
her that she had sleepwalked while staying overnight at her father's house. According to
S.W., I.E.W. said that: (1) she sleepwalked all the way outside of J.G.'s house, at which
point K.G. "drug" her back into the house; (2) she was then put back to sleep into the same
bed as J.G. and K.G.; and (3) J.G. was sleeping in the nude. According to police records
entered into evidence, S.W. contacted the Calhoun County Sheriff's Office to report these
events and to request a restraining order "because she [S.W.] did not want [K.G.] around
her daughter." S.W. was informed by a Sheriff's Office investigator, Rennett Todd, that the
events she described do not constitute a crime, and "there was nothing that could be done
on how [J.G.] chose to raise [I.E.W.] on his weekends." Investigator Todd noted in her
report that she told S.W. "that law enforcement could not get involved unless there was an
outcry made by [I.E.W.]."

 On the evening of October 21, 2007, after J.G. had returned I.E.W. to S.W., S.W.
contacted Officer Tim Smith, an assistant chief with the Seadrift Police Department, and
asked to file a report of abuse. According to the offense report entered into evidence, S.W.
told Officer Smith that I.E.W. "had been sexually abused while with [J.G.] the previous
evening." According to Officer Smith's report, S.W. stated that I.E.W. complained of
soreness in her genital area after returning home. S.W. also stated that I.E.W. told D.W.
that "Daddy touched me there," with "there" referring to her genital area. Officer Smith did
not attempt to interview the alleged perpetrator, J.G., or the alleged outcry witness, D.W. 
Instead, Officer Smith advised S.W. that he would arrange for a forensic interview and
SANE (Sexual Assault Nurse Examiner) examination as soon as possible. To this end, he
called his wife, Beverly Smith, an employee at the Harbor Children's Alliance and Victim
Center ("Harbor") in Port Lavaca, Texas. Beverly Smith conducted an interview with the
child the following morning. Officer Smith accompanied S.W., D.W., and I.E.W to Harbor
for the interview and, later that day, to Citizens Medical Center in Victoria, Texas, for the
SANE examination.

 At the Harbor interview, Beverly Smith talked with I.E.W. about private parts of the
body and then asked I.E.W. whether anyone had touched her private parts. I.E.W. first
said no, but then changed her answer and said that her father touched her private parts
with his finger. Beverly Smith then asked I.E.W. what her father said to her when he
touched her privates with his finger; I.E.W. responded that he said, "I will touch your
privates." According to Beverly Smith, that response "seem[ed] strange," but "it's not my
place to say that she is telling the truth or that she is not." I.E.W. further explained that the
touching occurred "[a]t my daddy's house . . . [i]n my room" and that K.G. was present at
the time.

 The SANE examination was conducted by Sexual Assault Nurse Examiner Leslie
Kallus. Kallus testified that I.E.W. informed her that "[m]y daddy touched me here [pointing
to her genital area] with his finger. It tickled. We were in my bedroom. It was light
outside." Kallus then asked I.E.W. more questions about the touching, but I.E.W. would
not answer. The physical examination revealed "some . . . sand-like debris bilaterally in
the labia majora, . . . some clear secretions surrounding the clitoris, and . . . a reddened
area from [two] o'clock to [eleven] o'clock on the hymen." Kallus testified that these
findings were "nonspecific," and "could be consistent with sexual assault or sexual abuse,
but [are] also seen in nonabused children." Kallus noted, as Beverly Smith did, that she
is trained to accept what children tell her as the truth, and that "it is beyond [her] scope" to
determine whether or not a child is being coached or coerced to make false allegations.

 J.G. denied ever having touched I.E.W. in an inappropriate way, or even in a way
that could be thought of by someone else as inappropriate. Nevertheless, as a result of
the outcry made by I.E.W., prosecuting attorneys sought charges against J.G. for
indecency with a child, a second-degree felony. See Tex. Penal Code Ann. § 21.11(a)(1),
(d) (Vernon Supp. 2009). Also as a result of the outcry, S.W. applied for a family violence
protective order forbidding J.G. from having contact with I.E.W. See Tex. Fam. Code Ann.
§ 85.022 (Vernon Supp. 2009). On December 10, 2007, J.G. was served with S.W.'s
protective order application as well as a temporary ex parte protective order prohibiting J.G.
from having contact with I.E.W. and setting a hearing for December 12, 2007.

 According to J.G., his criminal defense attorney advised that he consent to the entry
of the protective order "on a temporary basis to avoid a default or the necessity to stand
on his fifth amendment rights . . . in view of allegations of a felony." Therefore, on
December 12, 2007, without holding an evidentiary hearing, the trial court rendered a
"Temporary Protective Order" which had been consented to and signed by J.G., S.W., and
their attorneys. The order prohibited J.G. from: (1) committing family violence, as defined
in section 71.004 of the family code, see id. § 71.004 (Vernon 2008); (2) communicating
directly with I.E.W. in a threatening or harassing manner; (3) communicating in any manner
with I.E.W. except through S.W.'s attorney; (4) engaging in any conduct specifically
directed toward I.E.W. that is reasonably likely to "harass, annoy, alarm, abuse, torment,
or embarrass" I.E.W.; (5) going to or near S.W.'s residence or place of employment; and
(6) going to or near I.E.W.'s residence or any child-care facility or school she normally
attends. See id. § 85.022.

 In 2008, a Calhoun County grand jury "no-billed," or declined to indict, J.G. on the
indecency with a child charge. J.G. then filed a motion with the trial court on September
4, 2008, seeking to vacate the temporary protective order. See id. § 85.025 (Vernon
2008). In his motion, J.G. argued that: (1) S.W.'s protective order application was
insufficient because it did not contain a "detailed description of the facts and circumstances
concerning the alleged family violence," see id. § 82.009(1) (Vernon 2008); (2) the order
itself contained no finding of family violence as required by statute, see id. § 85.001
(Vernon 2008); and (3) there was no continuing need for the order, in part because J.G.
had been no-billed by the grand jury. (2)

 On November 24, 2008, after a full evidentiary hearing, the trial court rendered its
order denying J.G.'s motion to vacate. Subsequently, on J.G.'s request, the trial court
entered findings of fact and conclusions of law. The findings of fact included the following:

5. The Court finds that, prior to December 12, 2007, [J.G.] committed
family violence against [I.E.W.].


6. The Court finds that, prior to December 12, 2007, [J.G.] engaged in
sexual conduct toward [I.E.W.] which was harmful to [I.E.W.]'s mental,
emotional or physical welfare.


7. The Court finds that it is not in the best interest of [I.E.W.] that the
Temporary Protective Order rendered and signed December 12, 2007
be vacated.


8. The Court finds that it is not in the best interest of [I.E.W.] to modify
the terms and conditions of the Temporary Protective Order rendered
and signed December 12, 2007.


9. The Court finds that it is not in the best interest of [I.E.W.] that [J.G.]
be granted possession of [I.E.W.].


10. The Court finds that it is not in the best interest of [I.E.W.] that [J.G.]
be granted access to [I.E.W.].


11. The Court finds that there is a continuing need for the "Temporary
Protective Order" rendered and signed December 12, 2007.


12. The Court finds that it is in the best interest of [I.E.W.] that the
Temporary Protective Order remain in full force and effect.[ (3)]


The conclusions of law stated as follows:

1. The Temporary Protective Order rendered and signed December 12,
2007 is an order rendered and signed by mutual agreement and
consent of [J.G.] and [S.W.] pursuant to § 85.005 of the Texas Family
Code.


2. By virtue of his agreement and consent to the terms of the
"Temporary Protective Order" rendered and signed December 12,
2007, [J.G.] has judicially admitted that rendition of said order was in
the best interest of [I.E.W.].


3. By virtue of his agreement and consent to the terms of the
"Temporary Protective Order" rendered and signed December 12,
2007, [J.G.] has judicially admitted that rendition of said order was
necessary for the prevention of family violence.


4. By virtue of his agreement and consent to the terms of the
"Temporary Protective Order" rendered and signed December 12,
2007, [J.G.] is estopped from challenging the validity of the
"Temporary Protective Order" rendered and signed December 12,
2007.


5. The "Temporary Protective Order" rendered and signed December
12, 2007 should not be modified.


6. The "Temporary Protective Order" rendered and signed December
12, 2007 should not be vacated.


 This appeal followed.

II. Discussion

 On appeal, J.G. argues that the trial court erred in denying his motion to vacate the
protective order for the following reasons: (1) there was no evidence adduced as to events
occurring since the original rendition of the order that would justify continuation of the
order; (2) the original protective order "is overly-broad, excessive, a violation of [J.G.'s]
constitutional rights as a parent, and is not in the best interest of the child"; and (3) the
evidence adduced at the hearing on J.G.'s motion to vacate was legally and factually
insufficient to support the trial court's findings of fact and conclusions of law.

A. Mootness

 The protective order at issue expired two years after it was originally issued, on
December 12, 2009, which was after submission of the instant appeal to this Court. See
Tex. Fam. Code Ann. § 85.025(a) (stating that a protective order is effective until the
second anniversary of the date the order was issued, unless an earlier expiration date is
stated in the order). Therefore, even though the issue of mootness was not addressed or
briefed by either party, we must address whether or not J.G.'s appellate issues are moot. 
See Clements v. Haskovec, 251 S.W.3d 79, 83 (Tex. App.-Corpus Christi 2008, no pet.)
(citing Labrado v. County of El Paso, 132 S.W.3d 581, 589 (Tex. App.-El Paso 2004, no
pet.) (describing mootness as "a component of subject matter jurisdiction"));
Schaban-Maurer v. Maurer-Schaban, 238 S.W.3d 815, 822-23 (Tex. App.-Fort Worth
2007, no pet.). The general rule is that a case becomes moot, and thus unreviewable,
when it appears that a party seeks to obtain relief on some alleged controversy when in
reality none exists. Williams v. Lara, 52 S.W.3d 171, 184 (Tex. 2001); Clements, 251
S.W.3d at 83; Schaban-Maurer, 238 S.W.3d at 822. An expired temporary protective order
is generally considered moot for this reason. See James v. Hubbard, 21 S.W.3d 558, 560
(Tex. App.-San Antonio 2000, no pet.).

 However, Texas law recognizes a "collateral consequences" exception to the
mootness doctrine. See, e.g., Gen. Land Office of State of Tex. v. OXY U.S.A., Inc., 789
S.W.2d 569, 571 (Tex. 1990). This exception is applied when prejudicial events have
occurred that will continue to stigmatize the subject of the protective order long after the
order has ceased to operate. See Clements, 251 S.W.3d at 84; In re Cummings, 13
S.W.3d 472, 475 (Tex. App.-Corpus Christi 2000, no pet.). The exception applies to a
protective order containing a finding of family violence, because such a finding carries a
social stigma, as well as legal consequences, even after the order has expired. 
Schaban-Maurer, 238 S.W.3d at 822-23; James, 21 S.W.3d at 560; In re Cummings, 13
S.W.3d at 475; see Tex. Fam. Code Ann. § 153.004(f) (Vernon Supp. 2009) (mandating
that a trial court must consider the issuance of a protective order in determining child
custody issues); Clements, 251 S.W.3d at 84. We therefore conclude that J.G.'s appellate
issues are reviewable under the "collateral consequences" exception to the mootness
doctrine.

B. Applicable Law and Standard of Review

 A protective order under section 85.022 of the family code may not be issued unless
the trial court finds that family violence (1) has occurred and (2) is likely to occur in the
future. Tex. Fam. Code Ann. § 81.001 (Vernon 2008); § 85.001(a), (c). A person who is
the subject of a protective order "may file a motion . . . requesting that the court review the
protective order and determine whether there is a continuing need for the order." (4) Id. §
85.025(b). After a hearing, if the trial court finds there is a "continuing need" for the
protective order, the order will remain in effect until the statutory two-year period expires;
however, if the trial court finds there is no "continuing need," the court "shall order that the
protective order expires on a date set by the court." Id.

 The best interest of the child is the primary consideration in determining
conservatorship and possession of and access to the child. Id. § 153.002 (Vernon 2008). 
A trial court has wide discretion in determining the best interest of a child in family law
matters such as custody, visitation, and possession. Gillespie v. Gillespie, 644 S.W.2d
449, 451 (Tex. 1982). We will reverse the trial court's judgment only when it appears from
the record as a whole that the trial court abused its discretion. Id.; see Stamper v. Knox,
254 S.W.3d 537, 542 (Tex. App.-Houston [1st Dist.] 2008, no pet.) ("A trial court's decision
modifying the parent-child relationship is reviewed for abuse of discretion, and will only be
disturbed when it is clear the court acted in an arbitrary or unreasonable manner, without
reference to any guiding rules or principles.").


C. Analysis

 The December 12, 2007 order does not contain any finding that family violence
occurred or that family violence is likely to occur in the future. See Tex. Fam. Code Ann.
§ 85.001(a), (c). Instead, it states merely that the restrictions contained in the order "are
for the safety and welfare and in the best interest of members of the family and are
necessary for the prevention of family violence." After the November 24, 2008 hearing on
J.G.'s motion to vacate, the trial court did specifically find that J.G. had committed family
violence, but it made no finding as to a likelihood of future violence. See id. J.G. argues
that the failure of the trial court to make the requisite findings means, as a matter of law,
that it was error for the trial court to deny his motion to vacate.

 On the other hand, the trial court concluded, and S.W. contends on appeal, that
"[b]y consenting to the rendition of a protective order pursuant to the provisions of [section]
85.022, [J.G.] has judicially admitted all underlying facts necessary to the rendition of the
protective order." The trial court also concluded that J.G., having agreed to the original
protective order, is now "estopped from challenging the validity" of that order. We
disagree. By agreeing to the temporary protective order, it is apparent that J.G. voluntarily
consented to severe restrictions on his parental rights. Given the fact that the protective
order stated no expiration date, it can also be said that J.G. consented to the imposition
of these restrictions for as long as two years. See id. § 85.025(a). However, we are
unwilling to say that J.G. voluntarily consented to findings that he committed family
violence, and was likely to commit family violence in the future, merely because he
consented to the protective order. According to J.G., his consent to the rendition of the
December 12, 2007 protective order was on the advice of his criminal defense attorney,
and was done solely to avoid having to testify or plead his fifth amendment rights at a
protective order hearing. Regardless of whether this rationale was legally or strategically
sound, the fact remains that the December 12, 2007 order contained no explicit findings
as to family violence or the likelihood of future violence. We cannot presume that J.G.
would have consented to such an order had those findings been explicitly included.

 We note also that the doctrine of judicial estoppel, which underlies the concept of
judicial admission, is inapplicable here. For a judicial admission to exist and be conclusive
against a party, the following elements must be shown: (1) the statement relied on was
made during the course of a judicial proceeding; (2) the statement is contrary to an
essential fact embraced in the theory of recovery or defense asserted by the person who
made the statement; (3) the statement was deliberate, clear, and unequivocal; (4) giving
conclusive effect to the statement would be consistent with public policy; and (5) the
statement relates to a fact upon which a judgment for the opposing party may be based. 
Balaban v. Balaban, 712 S.W.2d 775, 777-78 (Tex. App.-Houston [1st Dist.] 1986, writ
ref'd n.r.e.). Here, even if one could infer the existence of family violence by J.G.'s consent
to the original protective order, the order certainly did not contain any "deliberate, clear, [or]
unequivocal" admission that family violence occurred or was likely to occur in the future. 
See id.; see also Tex. Fam. Code. Ann. § 85.005(e) (Vernon 2008) ("An agreed protective
order is not enforceable as a contract."). Further, the doctrine of judicial admissions does
not apply to contradictory positions taken in the same proceeding. Estate of Devitt, 758
S.W.2d 601, 604-05 (Tex. App.-Amarillo 1988, pet. denied). For these reasons, we
disagree with the trial court's conclusion that J.G. is estopped from challenging the validity
of the order by virtue of his prior consent.

 We therefore address J.G.'s substantive challenges to the original protective order,
to the trial court's denial of his motion to vacate, and to the findings of fact and conclusions
of law entered by the trial court.

 1. Evidence of Events Occurring Since Original Rendition of Order

 By his first issue, J.G. contends that the trial court erred in denying his motion to
vacate the December 12, 2007 protective order because there was no evidence adduced
as to events occurring since the original rendition of the order that would justify the
continuation of the order.

 Section 85.025(a)(1) of the Texas Family Code provides that, if a protective order
does not state an expiration date, the order shall expire two years after it is first issued. 
Tex. Fam. Code Ann. § 85.025(a)(2). As noted, section 85.025(b) provides that a person
who is the subject of a protective order "may file a motion requesting that the court review
the protective order and determine whether there is a continuing need for the order." Id.
§ 85.025(b).

 No evidence was adduced at the November 24, 2008 hearing indicating that, since
the protective order was issued, J.G. had committed any violations of the protective order
or had engaged in any other inappropriate behavior. J.G. argues that this compelled the
trial court to vacate the protective order. However, the fact that no family violence has
occurred since entry of the order does not necessarily mean that there is no continuing
need for the order. On the contrary, the trial court could have determined that: (1) the
protective order was itself the main factor ensuring that J.G. refrained from engaging in
objectionable behavior; and (2) without the protective order remaining in force, I.E.W.
would be left exposed to the potential danger that the order sought to eliminate.

 J.G. further claims that (1) "the Order was supposed to be temporary . . . and was
intended to last only so long as the criminal charges were pending," and (2) "[b]ecause it
was temporary, it was necessarily intended to last less than the statutory 2 years." 
However, J.G. does not provide this Court with any authority supporting these contentions. 
On the contrary, upon asking that the order be vacated, the burden was on J.G. to
establish that there was no "continuing need" for the order. See id. § 85.025(b). There is
no presumption that a protective order must expire prior to the statutory two-year limit, and
the order's characterization as "temporary" does not alter that fact.

 We overrule J.G.'s first issue.

 2. Challenges to Content of Protective Order

 By his second issue, J.G. argues that the original protective order, which prohibited
any contact between him and I.E.W., "is overly-broad, excessive, a violation of [J.G.'s]
constitutional rights as a parent, and is not in the best interest of the child."

 "The terms of an order that denies possession of a child to a parent or imposes
restrictions or limitations on a parent's right to possession of or access to a child may not
exceed those that are required to protect the best interest of the child." Id. § 153.193
(Vernon 2008). Even assuming that J.G. committed the act of family violence of which he
is accused, we find that the restrictions placed on J.G.'s access by the December 12, 2007
protective order far exceeded what was required to protect I.E.W.'s best interest. The trial
court was empowered, even if it found "a history or pattern" of family violence, to order
supervised visitation, among other things, in order to ensure that the child's best interests
are protected while also providing some access for the parent. See id. § 153.004(d); In re
J.R.D., 169 S.W.3d 740, 749 (Tex. App.-Austin 2005, pet. denied) ("The legislature has
declared a presumption that it is in the child's best interest to have the minimum amount
of time with any reasonably safe parent . . . ."). Instead, the trial court approved an agreed
protective order that prohibited any contact between J.G. and I.E.W., despite the fact that
only one instance of family violence had been alleged, and no facts had been alleged that
would support a finding of a likelihood of future violence. Even if J.G., upon advice of
counsel, deemed the protective order's restrictions to be in his best interest, it was the trial
court's responsibility to reject that agreed protective order if it was not in the best interest
of the child. See Tex. Fam. Code Ann. § 85.005(b) (noting that agreed protective orders
are subject to the trial court's approval); id. § 85.005(c) ("If the court approves an
agreement between the parties, the court shall render an agreed protective order that is
in the best interest of the applicant, the family or household, or a member of the family or
household."); id. § 153.002 ("The best interest of the child shall always be the primary
consideration of the court in determining the issues of conservatorship and possession of
and access to the child.").

 We note further that it is unclear whether the trial court even had the authority to
approve a protective order, such as the one agreed to by J.G. and S.W., that imposed such
severe restrictions on one parent's access to the child. Parties are permitted to consent
to protective orders, but such agreed orders are subject to the approval of the trial court,
and trial courts are strictly prohibited from approving any agreement that requires an
"applicant to do or refrain from doing an act under Section 85.022." Id. § 85.005(b). The
December 12, 2007 order precisely tracks the language of section 85.022 in requiring that
J.G. refrain entirely from, among other things, communicating with I.E.W. or going to or
near her residence. See id. § 85.022. If J.G. is considered an "applicant" under the
statute, then the trial court lacked the authority to approve of the agreed protective order
because it restricted J.G. as provided under section 85.022. See id. § 85.005(b).

 We conclude that the December 12, 2007 protective order violated the statute
governing such orders by (1) failing to include specific findings as to the likelihood of future
family violence, and (2) including restrictions on J.G.'s access to I.E.W. that exceeded what
was required to protect I.E.W.'s best interest. See id. §§ 85.001(c), 153.193. These
deficiencies were brought to the trial court's attention in J.G.'s motion to vacate and at the
subsequent hearing. See id. § 87.001 (Vernon 2008) ("On the motion of any party, the
court, after notice and hearing, may modify an existing protective order to: (1) exclude any
item included in the order; or (2) include any item that could have been included in the
order."); James, 985 S.W.2d at 518 (stating that a protective order is a permanent
injunction that "'may be reviewed, opened, vacated or modified by the trial court upon a
showing of changed conditions'") (quoting Smith v. O'Neill, 813 S.W.2d 501, 502 (Tex.
1991)). The trial court had no discretion, therefore, to deny that motion, and it was
reversible error for it to have done so. See Walker v. Packer, 827 S.W.2d 833, 840 (Tex.
1992) ("A trial court has no 'discretion' in determining what the law is or applying the law
to the facts."). Accordingly, we sustain J.G.'s second issue.

 3. Findings of Fact and Conclusions of Law

 J.G. contends by his third issue that the evidence was legally and factually
insufficient to support the trial court's findings of fact and conclusions of law issued after
the November 24, 2008 hearing on J.G.'s motion to vacate. We have already concluded
that the terms of the original protective order were contrary to I.E.W.'s best interests and
violated the statute governing such orders; accordingly, we reverse the findings of fact and
conclusions of law that are to the contrary. (5) We now consider the remaining findings
issued by the trial court; specifically, we address findings of fact numbers five and six,
stating that J.G. committed family violence against and engaged in sexual conduct with
I.E.W., respectively.

 When the trial court acts as a fact-finder, as here, we review its findings under
traditional legal and factual sufficiency standards. (6) In re Doe, 19 S.W.3d 249, 253 (Tex.
2000); Clements, 251 S.W.3d at 84. In considering legal sufficiency, we consider all the
evidence in the light most favorable to the trial court's finding, indulging every inference in
its favor. In re L.M.I., 119 S.W.3d 707, 718 (Tex. 2003). We will sustain a legal sufficiency
complaint only if the record reveals: (1) the complete absence of a vital fact; (2) the court
is barred by rules of law or of evidence from giving weight to the only evidence offered to
prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere
scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. City of
Keller v. Wilson, 168 S.W.3d 802, 810 (Tex. 2005). When the evidence offered to prove
a vital fact is so weak as to do no more than create a mere surmise or suspicion of its
existence, the evidence is less than a scintilla and, in legal effect, is no evidence. Ford
Motor Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004). The ultimate test for legal
sufficiency is whether the evidence at trial would enable reasonable and fair-minded people
to make the finding under review. See City of Keller, 168 S.W.3d at 827.

 In reviewing factual sufficiency, we consider all of the evidence and will uphold the
finding unless the supporting evidence is so weak or the finding so against the
overwhelming weight of the evidence as to render the finding manifestly unjust. Golden
Eagle Archery v. Jackson, 116 S.W.3d 757, 761-62 (Tex. 2003). We review conclusions
of law de novo. BMC Software Belg., N.V. v. Marchand, 83 S.W.3d 789, 794 (Tex. 2002).

 Under both legal and factual sufficiency standards, the fact-finder is the sole judge
of the witnesses' credibility and the weight to be given their testimony. See City of Keller,
168 S.W.3d at 819 (stating that, under legal-sufficiency standard, fact-finder is "the sole
judge . . . of the credibility of the witnesses and the weight to be given their testimony");
Pool v. Ford Motor Co., 715 S.W.2d 629, 635 (Tex. 1986) ("[I]n conducting a factual
sufficiency review, a court must not merely substitute its judgment for that of the jury . . . .");
Canal Ins. Co. v. Hopkins, 238 S.W.3d 549, 557 (Tex. App.-Tyler 2007, pet. denied) (op.
on reh'g).

 Here, the evidence showed that I.E.W. made an outcry of one instance of sexual
abuse to three people: (1) D.W., I.E.W.'s grandmother; (2) Beverly Smith, who interviewed
I.E.W. at Harbor; and (3) Kallus, the nurse that conducted the SANE examination on I.E.W. 
According to Kallus, her examination of I.E.W's genital area revealed abnormalities that
may or may not have been the result of sexual abuse. J.G. argues that "[t]he evidence of
any sexual assault boils down to two bare hearsay statements by [I.E.W.] that were made
in response to direct and suggestive questioning in the context of determining why her
genital area was red and swollen." While this may be true, J.G. does not challenge the
admissibility of Smith's or Kallus's testimony as to I.E.W.'s outcry, nor does he suggest that 

"the court is barred by rules of law or of evidence from giving weight" to that evidence. See
City of Keller, 168 S.W.3d at 810. The fact that I.E.W. made a substantially similar outcry
statement to three different people gives rise to more than a mere suspicion that the events
she described actually occurred; that is, the evidence supporting the trial court's findings
amounts to more than a mere scintilla. See Ford Motor Co., 135 S.W.3d at 601. Our
review of the evidence also shows that J.G. did not establish conclusively that the outcry
statements made by I.E.W. were false, coached, or coerced. See City of Keller, 168
S.W.3d at 827.

 Viewing the evidence in the light most favorable to the trial court's findings, we
cannot say that reasonable and fair-minded people could not have reached those same
conclusions. See id. Moreover, considering all the evidence, we cannot conclude that the
trial court's findings are so contrary to the great weight and preponderance of the evidence
as to be manifestly unjust. See Golden Eagle Archery, 116 S.W.3d at 761-62. We
therefore conclude that the evidence adduced at the November 24, 2008 hearing was
legally and factually sufficient to support findings of fact numbers five and six. (7) J.G.'s third
issue is overruled.

III. Conclusion

 We reverse the judgment of the trial court denying J.G.'s motion to vacate and
render judgment vacating the December 12, 2007 temporary protective order in its entirety. 
Further, we affirm in part and reverse in part the trial court's findings of fact and
conclusions of law as stated in this opinion.




 

 DORI CONTRERAS GARZA,

 Justice


Delivered and filed the

27th day of August, 2010.
1. The agreed order changed I.E.W.'s name by appending J.G.'s surname thereto. For convenience,
we will refer to the child as I.E.W., which are the initials of her name as used in the trial court proceedings,
rather than I.E.W.-G., which are the initials of her legal name according to the January 25, 2005 order.
2. J.G. noted in his motion to vacate that:


on the advice of legal counsel [he] did not . . . testify at the protective order hearing by virtue
of the then pending Grand Jury presentation and therefore signed an 'AGREED' and
'TEMPORARY' protective order to avoid testifying or the possibility of a default finding of
family violence. [J.G.] alleges his actions in signing the Temporary Order was [sic] the only
reasonable manner of due process available to defend himself from the false accusations
and that he has suffered damages as a result thereof.


(Emphases in original.)
3. The trial court also made certain "negative" findings of fact, stating that:


The evidence admitted at trial failed to establish, by a preponderance of the credible
evidence, the following facts:


1. That it is in the best interest of [I.E.W.] that the "Temporary Protective Order"
rendered and signed December 12, 2007 be modified.


2. That it is in the best interest of [I.E.W.] that the "Temporary Protective Order"
rendered and signed December 12, 2007 be vacated.


3. That there is not a continuing need for the "Temporary Protective Order" rendered
and signed December 12, 2007.


4. That it is in the best interest of [I.E.W.] that [J.G.] be granted access to [I.E.W.].


5. That it is in the best interest of [I.E.W.] that [J.G.] be granted access possession of
[I.E.W.].
4. Section 85.025(b) of the family code provides that a motion to vacate a protective order may be filed
"not earlier than the first anniversary of the date on which the order was rendered . . . ." Tex. Fam. Code Ann.
§ 85.025(b) (Vernon 2008). Although the hearing and order on J.G.'s motion to vacate took place more than
one year after the protective order was rendered, the motion itself was filed on September 4, 2008, which was
less than one year after the original rendition of the order on December 12, 2007. Nevertheless, neither party
raised the issue of the timeliness of J.G.'s motion either with the trial court or with this Court, and we do not
address that issue here. See Tex. R. App. P. 33.1(a); 47.1.
5. Specifically, we reverse the trial court's findings of fact numbers seven through twelve; conclusions
of law numbers two through six; and all five "negative" findings of fact.
6. We note that Texas appellate courts are divided over the proper standard to employ in reviewing
the evidence supporting protective orders. Compare In re Epperson, 213 S.W.3d 541, 543 (Tex.
App.-Texarkana 2007, no pet.) and Thompson v. Thompson-O'Rear, No. 06-03-00129-CV, 2004 Tex. App.
LEXIS 5033, at *4 (Tex. App.-Texarkana June 8, 2004, no pet.) (mem. op.) (applying abuse of discretion
standard) with Clements v. Haskovec, 251 S.W.3d 79, 84 (Tex. App.-Corpus Christi 2008, no pet.) and
Vongontard v. Tippit, 137 S.W.3d 109, 112 (Tex. App.-Houston [1st Dist.] 2004, no pet.) (applying legal and
factual sufficiency standard).
7. We note that evidence that a person has engaged in abusive conduct in the past may allow, but
does not require, an inference that the person will continue violent behavior in the future. Schaban-Maurer
v. Maurer-Schaban, 238 S.W.3d 815, 824 (Tex. App.-Fort Worth 2007, no pet.); see Clements, 251 S.W.3d
at 87-88; In re Epperson, 213 S.W.3d at 543-44 ("Oftentimes, past is prologue; therefore, past violent conduct
can be competent evidence which is legally and factually sufficient to sustain the award of a protective order.");
see also Gonzalez v. Galvan, No. 13-08-488-CV, 2009 Tex. App. LEXIS 2788, at *5-6 (Tex. App.-Corpus
Christi Apr. 23, 2009, no pet.) (mem. op.). However, the trial court made no finding, at any point in the
underlying proceedings, that there was a likelihood of future family violence in this case. Therefore, we do
not address the question of whether the evidence adduced at the November 24, 2008 hearing supported such
a finding.